IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

| | | |
|---|---|---|
| Paula Young, | ) | |
| Plaintiff, | ) | Civil Action No.2:12-2337-RMG-WWD |
| | ) | |
| vs. | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF MAGISTRATE JUDGE** |
| CareAlliance Health Services d/b/a | ) | |
| Roper St. Francis Healthcare, | ) | |
| Defendant. | ) | |

This matter is before the Court on the Defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Doc. No. 77.) The Plaintiff's Amended Complaint contains ten causes of action. The Court has already dismissed the Plaintiff's claims under the South Carolina Human Affairs Law and for breach of contract. (Doc. No. 29.) The Defendant now also moves for summary judgment as the Plaintiff's remaining clams for race/national origin discrimination under Title VII, disability discrimination under the ADA, retaliation under Title VII, violation of the South Carolina Payment of Wages Act, defamation, false imprisonment, abuse of process, malicious prosecution, and intentional infliction of emotional distress.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

## FACTUAL BACKGROUND

The Plaintiff, a registered nurse, was hired by the Defendant, on May 9, 2010, for the position of staff nurse in the Neuro-Spine Center at its Bon Secours St. Francis Hospital location. The Neuro-Spine Center provides surgical and non-surgical care for problems involving the brain, spine, and peripheral nerves. (Brannigan Aff. ¶ 3.) Cathleen Brannigan,

Director of the Neuro-Spine Center, interviewed the Plaintiff, made the decision to hire her, and was fully aware of the Plaintiff's race (Hispanic) and national origin (Chilean) at the time of hire. (Pl. Dep. at 76- 78; Brannigan Dep. at 40-41.)

The Defendant contends that the Plaintiff began to exhibit various job deficiencies which were reported to Brannigan by coworkers, physicians, other supervisory personnel, and personally observed by Brannigan.  The Plaintiff's deficiencies allegedly included:  poor organizational skills, inability to effectively communicate pertinent patient information to the next shift nurses or to physicians caring for patients, inability to finish her work during the shift hours, and other job deficiencies. (Brannigan Dep. at 46-47, 74-76, Pl. Ex. 2 ¶ 4; Pl. Dep. at 84, 151, 220.)

In addition, the Plaintiff's narcotic administration practices were called into question, beginning February 11, 2011, when the night nursing supervisor, Debbie Dingler, was called to assist managing the lumbar drain of one of the Plaintiff's patients. (Pl. Dep. at 221-222; Dingler Dep. at 146-147, Def. Ex. 1). During that encounter, the Plaintiff allegedly responded inappropriately to a question relating to her administration of narcotic medication to a patient. (Dingler Dep. at 41-42.)  Dingler was so apparently troubled by the reaction she requested an audit of the Plaintiff's medication administration records and also reported the incident to Brannigan. (Dingler Dep. at 43, 146-147, Def. Ex. 1.)

The medication administration audit and subsequent investigation revealed a number of confirmed serious and suspicious incidents of mishandling of narcotic medication and controlled substances within a six-week period including the following:

a. Four instances of missing and unaccounted for doses of narcotic medication (Brannigan Dep. at 67-69, Pl. Ex. 2);

b. One instance of erroneous documentation of administration of narcotic medication (Brannigan Dep. at 65, Pl. Ex. 2);

2

c. Four instances of delayed return and/or wasting[1] of narcotic medication (Brannigan Dep. at 65-67, Pl. Ex. 2); and

d. Three instances of administration of narcotic pain medication without documentation of the patient's condition required by the Defendant's Pain Management Policy (Brannigan Dep. at 65, Pl. Ex. 2; Brannigan Aff. ¶ 5, Ex. A, RSFH 1911-1915).

An Employment Conference Record (ECR) regarding the Plaintiff was prepared and expanded beyond the medication errors to include other performance issues. (Brannigan Aff. ¶ 8, Ex. D (RSFH 2330); Brannigan Aff. ¶ 8). Subsequently, Brannigan spoke with Pennie Peralta, Vice President Nursing and Senior Nurse Executive, who recommended the Plaintiff be drug tested. (Brannigan Dep. at 130; Peralta Aff. ¶ 7.)

The drug test was performed on March 18, 2011. In conjunction with the drug test, an inventory of the Plaintiff's locker revealed that she was in possession of two patient armbands, which contain personal health information on the patients whose names appeared on the bands – a violation of the Defendant's internal HIPAA policy. (Dingler Dep. at 94, 141; Brannigan Dep. at 83-85 (RSFH 1884-1887,1897-1899).). The armbands belonged to patients that were involved in the medication administration discrepancies. (Brannigan Dep. at 127-128.)

The Plaintiff was suspended without pay pending the results of the drug screen. (Inabinet Dep. at 53; Pl. Dep. at 165-166).) The drug test was negative. (Brannigan Aff. ¶ 14, Ex. I (RSFH 2363 – 2372, 2378-2382).) The hospital privacy officer was called in to

---

[1] As per hospital policy, certain medications are secured in Pyxis, an automated medication dispensing system, until the time of administration. (Peralta Dep. at 26-27, Pl. Ex. 2). If medication is removed from Pyxis and is not going to be given in a timely manner, the medication must be wasted, or disposed of properly according to policy. (Peralta Dep. at 27-31, Pl. Ex. 2).

investigate the potential breach of patient confidentiality related to the patient armbands discovered in the Plaintiff's locker. (Inabinet Dep. at 52-53, Pl. Ex. D.)

On March 31, 2011, the Plaintiff was notified that she was also being investigated for violating Hospital Policies on Confidentiality of Protected Health Information (PHI) and Health Insurance Portability and Accountability Act (HIPAA) Privacy and Security Sanctions for mishandling patient information because the patient armbands were discovered in her locker. (Pl. Dep. at 197-199; Inabinet Dep. at 40.)  The Plaintiff continued on unpaid leave, pending the results of the investigation by the Privacy Officer.  (Inabinet Aff. ¶ 7, Ex. D (RSFH 2428).)

On April 1, 2011, the Plaintiff presented the Defendant with a three-page letter, complaining for the first time that she was being treated unfairly because she is Hispanic. (Pl. Dep. at 202-203, Def. Ex. 11.)  The Plaintiff cited six incidents that she claimed were evidence of racial/national origin discrimination, which will be discussed in some more detail in the Court's discussion below. (Pl. Dep., Def. Ex. 11.)  Upon receiving the Plaintiff's letter, the Defendant claims to have investigated the allegations. (Inabinet Dep. at 44, Pl. Ex. B)

The hospital privacy officer who completed the HIPAA investigation concluded that the Plaintiff violated the policies on Protected Health Information and HIPAA Privacy and Security Sanctions. (Brannigan Dep. at 83-85, Def. Ex. 2.)  The Plaintiff's actions were deemed a Level II violation of the HIPAA Privacy and Security Sanctions policy. *Id.*; (Inabinet Dep., Pl. Ex. D).  By April 6th, Brannigan finalized her decision to terminate the Plaintiff, and the ECR was updated to include information about the results of the HIPAA investigation. (Inabinet Aff. ¶ 9, Ex. F (RSFH 2459-2463).)

Brannigan sought to meet with the Plaintiff, on April 7, 2011, to terminate her employment. (Brannigan Aff. ¶ 17.)  The Plaintiff received word on that same day that her mother had suffered a stroke. (Pl. Dep. at 206.)  She left the country on April 8, allegedly

4

without telling the Defendant. *Id.* By letter dated April 8, 2011, Plaintiff's counsel contacted the Equal Employment Opportunity Commission (EEOC). (RSFH 1975). On April 12, 2011, the Defendant attempted to meet with the Plaintiff, but spoke instead with the Plaintiff's husband, who advised that she was in Chile because her mother had passed away. (Inabinet Dep. at 50, Pl. Ex. C.) The EEOC, on April 13 sent the Defendant a Notice of Charge, which was received on or about April 18, 2011. (Inabinet Aff. ¶ 10, Ex. G (RSFH 2197- 2198).)

The Plaintiff was notified by letter, dated May 19, 2011, that she was being terminated, effective May 9, 2011. (Inabinet Dep. at 50, 63-65, Pl. Ex. C.) The letter included a copy of the ECR detailing the numerous bases for her termination. *Id.*

On July 6, 2011, Peralta made a complaint to the South Carolina Board of Nursing, which is part of the South Carolina Department Labor, Licensing and Regulation ("LLR"), regarding the Plaintiff's medication administration errors and other reasons for termination. (Peralta, p. 23; Sanders at 16, 45, Def. Ex. 1.)

This lawsuit followed.

## APPLICABLE LAW

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion

5

only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1).

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

6

**DISCUSSION**

I.    **Race Discrimination**

The Plaintiff first contends that she was drug tested, suspended, and eventually fired on account of her race and national origin in violation of Title VII. The Defendant seeks dismissal of the claim.

The Fourth Circuit has explained that a Title VII plaintiff may "avert summary judgment . . . through two avenues of proof." *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005) (quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004)). A plaintiff can survive a motion for summary judgment by presenting direct or circumstantial evidence that raises a genuine issue of material fact as to whether an impermissible factor such as race motivated the employer's adverse employment decision. *Diamond*, 416 F.3d at 318. Pursuant to the Civil Rights Act of 1991, the impermissible factor need not have been the sole factor. As long as it motivated the adverse action, the plaintiff can establish an unlawful employment practice. *See* 42 U.S.C. § 2000e-2(m). Alternatively, a plaintiff may "proceed under [the *McDonnell Douglas*] 'pretext' framework, under which the employee, after establishing a prima facie case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination." *Hill*, 354 F.3d at 285; *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). The Plaintiff has only argued *McDonnell Douglas*.

*McDonnell Douglas* requires that an employee first prove a *prima facie* case of discrimination by a preponderance of the evidence. If she succeeds, the employer has an opportunity to present a legitimate, nondiscriminatory reason for its employment action. If the employer does so, the presumption of unlawful discrimination created by the *prima facie* case drops out of the picture, and the burden shifts back to the employee to show that the given reason was just a pretext for discrimination. *See McDonnell Douglas*, 411 U.S. at 802-03.

7

In *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000), the Supreme Court reiterated that evidence of pretext, combined with the plaintiff's *prima facie* case, does not compel judgment for the plaintiff, because " [i]t is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." *Id.* at 147 (citation omitted). The Court also stated that, under the appropriate circumstances, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* It is the plaintiff's burden to create an inference that the defendant's proffered reason is a pretext for intentional discrimination. *See id.* at 147-48. Pretext analysis does not convert Title VII into a vehicle for challenging unfair--but nondiscriminatory--employment decisions. *Holder v. City of Raleigh*, 867 F.2d 823, 828 (4th Cir.1989). Conclusory allegations, without more, are insufficient to preclude the granting of the defendant's summary judgment motion. *See Ross* v. *Commc'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985) *abrogated on other grounds by Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).

### A.     *Prima Facie* Case

To establish a *prima facie* case of discriminatory discharge, the plaintiff must show: (1) that she is a member of a protected class; (2) that she suffered an adverse employment action; (3) that at the time the employer took the adverse employment action she was performing at a level that met her employer's legitimate expectations; and (4) other employees who are not members of the protected class were retained under apparently similar circumstances. *See Bryant v. Bell Atlantic Md., Inc.*, 288 F.3d 124, 133 (4th Cir. 2002).

"The precise requirements of a prima facie case can vary depending on the context and were never intended to be rigid, mechanized, or ritualistic." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512 (U.S. 2002) (quotations omitted). Although other evidence might

suffice, the Court is generally open to evidence that similarly situated employees outside the protected class received more favorable treatment. *See White v. BFI Waste Servs.*, LLC, 375 F.3d 288, 295 (4th Cir. 2004).

The Defendant contends that the Plaintiff cannot establish the third and fourth elements of her *prima facie* case.

In regards to whether the Plaintiff was meeting the Defendant's legitimate performance expectations, the Defendant contends that the Plaintiff was suspended and her employment was terminated for various performance deficiencies. Specifically, it has submitted evidence that the Plaintiff exhibited the following: poor organizational skills, inability to effectively communicate pertinent patient information to the next shift nurses or to physicians caring for patients, inability to finish her work during the shift hours, and other job deficiencies. (Brannigan at 46-47, 74-76, Pl. Ex. 2 ¶ 4; Young Dep. at 84, 151, 220.) In addition, as stated, the Plaintiff's narcotic administration practices were called into question, starting on February 11, 2011, when the night nursing supervisor, Debbie Dingler, was called to assist managing the lumbar drain of one of the Plaintiff's patients. (Young Dep. at 221-222; Dingler Dep. at 146-147, Def. Ex. 1.) The subsequent medication administration audit and investigation revealed a number of confirmed serious and suspicious incidents of mishandling of narcotic medication and controlled substances within a six-week period including:

- Four instances of missing and unaccounted for doses of narcotic medication (Brannigan at 67-69, Pl. Ex. 2);

- One instance of erroneous documentation of administration of narcotic medication (Brannigan, p. 65, Pl. Ex. 2);

- Four instances of delayed return and/or wasting of narcotic medication (Brannigan at 65, Pl. Ex. 2) (Brannigan at 66, Pl. Ex. 2) (Brannigan at 67, Pl. Ex. 2) and;

- Three instances of administration of narcotic pain medication without documentation of the patient's condition required by RSFH's Pain Management Policy (Brannigan at 65, Pl. Ex. 2) (Brannigan Aff. ¶ 5, Ex. A, RSFH 1911-1915).

Last of all, an inventory of the Plaintiff's locker revealed that she was in possession of two patient armbands which contain personal health information on the patients whose names appeared on the bands – a violation of the Defendant's HIPAA policy. (Dingler Dep. at 94, 141; Brannigan Dep. at 83-85 (RSFH 1884-1887,1897-1899).) The armbands belonged to patients that were involved in the medication administration discrepancies. (Brannigan at 127-128.)

The Plaintiff responds that "there is an abundance of evidence that illustrates Young was not only performing her job satisfactorily and meeting Roper's expectations, but even more, that she was *exceeding* Roper's expectations." (Pl. Resp. at 14.) To that end, the Plaintiff has put forward evidence that she received two nominations for "Acts of Kindness" awards from David Dunlap, the President and Chief Executive Officer of Roper himself. (Pl. Ex. O.) The Plaintiff also claims to have received several cards from patients she cared for expressing their gratitude for providing a superior level of care to them during their hospital stays. *Id.* For year 2010, the Plaintiff received a fully successful performance review issued by Cathy Brannigan on January 23, 2011. (Pl. Ex. K.) Specifically, her total performance score was 3.1, representing a "Fully Successful" rating. *Id.* The evaluation stated "Paula's peers enjoy working with her. She attends 100% of staff meetings and is committed to improving the performance of the team. If Paula has an issue with someone, she goes directly to the person and does not participate in gossip which negatively impacts a unit's culture." *Id.* Furthermore, she received a rating of "Fully Successful" or better in all areas, with the exception of a "Needs Improvement" in the domain of "Finance: Stewardship." *Id.* Notations under this domain appear related to the Plaintiff's alleged disability and need for associated sick leave: "Paula has called out sick 4 occurrences. According to the WOW

10

[Work Only Weekend] policy, if an employee exceeds 2 unplanned absences in 6 months, they may be removed from the WOW plan." *Id.* On the last page of her evaluation issued on January 23, 2011, the evaluation notes that the Plaintiff had "0 Medication Errors," did a "great job charting safety checks and SCDs on/off," and "Medication barcode scanning rate YTD 99%." *Id.* On January 21 and 24, 2011, patients provided glowing reviews of the care received from the Plaintiff while hospitalized stating "Becky, Paula, and Wanda went above and beyond to make sure I was comfortable and felt safe" and "the care is wonderful." (Pl. Ex. O.)

The view of satisfied patients concerning the Plaintiff's performance does not create issues of fact regarding the second element. "Whether an employee is performing at a level that meets legitimate expectations is based on the employer's perception, and [the plaintiff's] own, unsubstantiated assertions to the contrary are insufficient to stave off summary judgment." *Morrall v. Gates*, 370 F. App'x 396, 398 (4th Cir. 2010). Likewise, evidence of nominations for "Acts of Kindness" awards does not precisely meet the specific allegations of performance deficiencies by the Defendant. Her gentility is neither accuracy nor completeness in work performance.

The Plaintiff has effectively emphasized the objective evidence of a satisfactory performance review. But, the Defendant argues that the performance review did not cover any event in 2011, when all of the alleged problems arose. "The relevant time to evaluate the an (sic) employee's performance is at the time of the adverse action." *Wells v. Briggs Constr. Equip. Inc.*, 2010 WL 2991673, at *11-12 (D.S.C. May 12, 2010), *adopted*, 2010 WL 2991681 (July 28, 2010) (citation omitted). But, ironically, upon closer inspection of the very cases cited by the Defendant the focus likely ought not be on the incidents of deficiency themselves. Our district court has stated, in assessing the third element, "the Court looks to how the Plaintiff had generally been performing his job *prior to the incident* at issue in the lawsuit." *Shumpert v. Mancor Carolina, Inc.*, 2004 WL 3583987, at *9 (D.S.C. Mar. 10, 2004)

11

(emphasis added and citation omitted).  The cases cited in *Shumpert* are even more clarifying.  See *Brown v. Chicago Transit Auth.*, 1999 WL 495622 at *5 (N.D. Ill. June 28, 1999) (finding that the plaintiff's general job performance, not the specific incident(s) which may have precipitated his termination, is the proper question to consider in determining whether plaintiff can establish the satisfactory performance element of his prima facie case); *Crosby v. Fed. Signal Corp.*, 1998 WL 603125, at *5 (N.D. Ill. Sept.4, 1998).  Intuitively, this seems right.  What was the condition of the job performance prior to the accusation that it was insufficient?  In this respect, the Plaintiff, through a satisfactory 2010 review, has certainly created some issue of fact as to the quality of her performance prior to the 2011 incidents.

But, the Fourth Circuit Court of Appeals decision, in *Warch v. Ohio Casualty Insurance Co.*, 435 F.3d 510, 515 (4th Cir. 2006), suggests otherwise: "We also reject Warch's contention that consideration of the employer's legitimate job expectations at the prima facie stage improperly allows consideration of evidence the employer would typically present in the second stage of the *McDonnell Douglas* framework, that is, where the employer offers the legitimate, non-discriminatory reason for the termination." *Id*.  In other words, the predicate acts of poor performance leading to termination may be considered in whether a plaintiff was meeting the legitimate job expectations of their employment.

If the performance accusations outlined are properly considerable, then the Plaintiff cannot establish the third element.  The performance review from the year before would be insufficient to rebut it. If, however, the Plaintiff's performance up to the point of her allegedly faltering performance in 2011 is only relevant then the element is satisfied.  Regardless, the Court would continue to consider the claim as though this element could be established.

As an additional basis, the Court also generally agrees with the Plaintiff that typically in cases where it is alleged that an employer has failed to take adverse action against other similarly situated employees who are not meeting the employer's performance expectations,

the employee need not even show the third element of satisfactory job performance. *See*

*Flores v. Preferred Technical Group*, 182 F.3d 512 (7th Cir. 1999) (stating that the plaintiff

did not have to show satisfactory job performance where she showed that similarly situated

employees outside protected class engaged in the same type of inappropriate conduct, but

were not treated similarly); *Hazel v. Med. Action Indus., Inc.*, 216 F. Supp. 2d 541, 546

(W.D.N.C. 2002) ("If this court were to read the second element as strictly as defendant

suggests, the court can imagine no way any claim for racially disparate treatment could ever

survive."). Rather in such instances, the satisfactory work performance analysis is merged

into the final element of *McDonnell Douglas* as it "is more appropriately considered in the

analysis of pretext" as both involve considerations of a plaintiff's treatment as compared with

other similarly situated employees outside of the protected class. *Curry v. Menard, Inc.*, 270

F.3d 473, 478 (7th Cir. 2001).

　　　　Issues of fact potentially exist concerning the third element of the *prima facie* case.

　　　　With respect to the fourth element that other employees who are not members of the

protected class were retained under apparently similar circumstances, the Plaintiff has

partially merged her argument with the pretext analysis. (Pl. Resp. at 16.) As discussed

above, this  presentation is permissible and the Court would simply discuss, for purposes

of both the *prima facie* case and pretext analysis, the quality of the Plaintiff's evidence

concerning a similarly situated comparator generally. As stated, the Court is generally open

to evidence that similarly situated employees outside the protected class received more

favorable treatment.  *See White*, 375 F.3d at 295.

　　　　The Plaintiff has identified Kimberly Harrelson, a white female of non-Hispanic and

non-Chilean descent. The Plaintiff and Harrelson held the same position, both were

supervised by Brannigan, both were subjected to the same standards, and they were the

only two Registered Nurses working on the Neurospine floor seventy percent (70%) of the

time. (Harrelson Dep. at 13-14; 56-58.) The Plaintiff attempts to position Harrelson as an

13

employee with a lengthier and more aggravated disciplinary history than herself.  She highlights a written warning in December 2005 for not demonstrating appropriate nursing standard of care; a written warning in February 2007 for nine occurrences of absenteeism; a written warning in October 2008 for excessive absenteeism; and a written warning in May 2010 for failure to meet WOW staffing policy attendance requirements. (Pl. Ex. R at 4-8.) In addition, an internal notation from the Defendant, dated March 24, 2011, indicates that "Kim Winningham [Harrelson] should have refused to sign off on a waste so we'll need to write her up (is on FMLA)."  *Id.* at 1. The Plaintiff claims that the Defendant was not able to produce any evidence indicating that such a writeup actually occurred around this time. Harrelson also testified at her deposition that no one working for the Defendant had ever discussed medication wasting errors with her and that there were times when she had problems getting another nurse to help her waste medications due to a busy shift. (Harrelson Dep. at 42, 56.)

Brannigan also confirmed at her deposition that Harrelson had disorganization issues on the clinical side with taking care of patients, that Harrelson was not getting her work done, and that she had "sloppy medication administration practice." (Brannigan Dep. at 19, 21. She identified a specific example when Harrelson left an NG [nasogastric] tube open on a patient and drainage was left on the patient's bed.  *Id.* at 20.  Brannigan provided yet another example when Harrelson showed up late to work (during a period of consistent tardiness), was unresponsive in her car, and suspected of drug use/overdose. *Id.* at 162-164.

In discussing the Defendant's policies on medication wasting,[2] Harrelson reported that she was not aware of any policy stating the exact time limit for completing a medication

---

[2] As stated *supra* n.1 and per hospital policy, certain medications are secured in Pyxis, an automated medication dispensing system, until the time of administration. (Peralta Dep. at 26-27, Pl. Ex. 2). If medication is removed from Pyxis and is not going to be given in a timely manner, the medication must be wasted, or disposed of properly according to policy. (Peralta Dep. at 27-31, Pl. Ex. 2).

14

waste. (Harrelson Dep. at 54.)  She also confirmed that she had never been reported to the LLR/Board of Nursing. *Id.* at 23.  Harrelson further admitted that she had charting errors when working for the Defendant. *Id.* at 91. She, nevertheless, voluntarily resigned from working for the Defendant in November 2012. *Id.* at 18-20.  She further indicated that she did not resign because she felt she was going to be fired or because anyone told her she would fired if she did not resign.  *Id.* at 20. Unlike the Plaintiff, she was never asked to submit to a reasonable suspicion drug screen while she worked for the Defendant. *Id.* at 116.  Last of all, records produced by the Defendant also demonstrate that Harrelson was given the benefit of an additional written warning in July 2012 for 12 occurrences of unplanned absences, 11 instances of arriving at work late, 17 instances of forgetting to clock out for lunch, not following the proper standards of behavior when communicating with patients, and failing to adhere to the pain assessment policy. (Pl. Ex. R at 2-3.)

The Defendant protests that Harrelson is not a valid comparator principally because it is undisputed that there is no evidence that Harrelson violated the Defendant's HIPAA policies. (Pl. Resp. at 16). In addition, unlike the Plaintiff, Harrelson had no missing medications or narcotics. The Defendant concedes that Harrelson had performance issues, but that she independently sought Brannigan out about them. (Brannigan Dep. at 16.)  A resulting audit revealed that Harrelson was spending time assisting patients other than her own. (Brannigan Dep. at 14-16.) The Defendant admits that some medication wasting errors were discovered, but, again, different from the Plaintiff, there were no missing medications or narcotics. (Brannigan Dep. at 14, 17, 198-199.) A Corrective Action Conference Record was prepared, and it is alleged that Brannigan intended to terminate Harrelson. (Brannigan Dep. at 35, 196-98.)  During the course of the meeting to do so, however, which also included Nancy Inabinet, Harrelson explained that she was experiencing depression as a result of having a young child and being unable to sleep. (Brannigan Dep. at 196-198.)  The meeting was stopped, and Harrelson was given FMLA leave. (Brannigan Dep. at 197.)

15

When she returned from leave, the Defendant was unable to meet a request for a day shift position, so Harrelson resigned to take a job at MUSC. (Brannigan Dep. at 198; Harrelson Dep. at 20.)

It is a close call whether Harrelson should be considered as similarly situated and a relevant comparator. There is a substantial degree of overlap in the admitted conduct, including undisputed incidences of medication wasting, poor documentation, and other generalized performance issues. Notwithstanding, there are two glaring distinctions in the performance portfolios of the Plaintiff and Harrelson, namely the four instances of missing and unaccounted for narcotics (Brannigan Dep. at 67-69) and two patient armbands found in the Plaintiff's locker, which constituted a violation of the Defendant's HIPAA policy (Dingler Dep. at 94, 141; Brannigan at 83-85.) In the constellation of performance deficiencies as between the two individuals, these seem distinguishing. The Court does not mean to require a one-for-one analog between the conduct of two employees before they can be considered similarly situated, but the allegations are sufficiently different that the Court believes allowing a jury to use Harrelson as a barometer of measure against the Defendant's conduct would be a step too far. The "plaintiff must establish that 'other employees' were similarly situated in all relevant respects; that they 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *See Ward v. City of N. Myrtle Beach*, 457 F. Supp. 2d 625, 643 (D.S.C. 2006). The Court, therefore, believes that Harrelson should not be considered similarly situated either for purposes of the *prima facie* case or to establish pretext. For those reasons, the claim should fail.

In satisfaction of the fourth element, the Plaintiff also offers that she was replaced by Angela Mann (Caucasian/American), an existing employee who already worked in the Neuro- Spine unit and who was moved to the WOW shift. (Pl. Resp. at 16; ECF 85-6 at 12.)

16

Typically, the redistribution of responsibilities to existing employees is not sufficient to establish this element of a *prima facie* case.  See *Lindquist v. Tanner*, 2013 WL 4441946, at *14 (D.S.C. June 26, 2013); *see also Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 519-20 (4th Cir. 2006).

Even if it somehow were and the Plaintiff's *prima facie* case made, the undersigned disagrees that any pretext can be established.

### B.    Legitimate, Non-Discriminatory Reason

The Defendant has the burden to produce a legitimate, non-retaliatory reason for taking the adverse actions it did. *See  Lamb v. Qualex, Inc.*, 33 F. App'x 49, 60 (4th Cir. 2002).  As detailed above, the Defendant has identified various performance deficiencies. "Job performance and relative employee qualifications [are] widely recognized as valid, non-discriminatory bas[i]s for any adverse employment decision." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996); *see also Mackey v. Shalala*, 360 F.3d 463, 468 (4th Cir. 2004); *Karpel v. Inova Health Sys. Servs.*, 134 F.3d 1222, 1229 (4th Cir. 1998).

### C.    Pretext

Because the Defendant has proffered legitimate, non-discriminatory reasons for its actions, the Plaintiff bears the burden of demonstrating that the real reasons were, in fact, unlawful. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000). As is most common, the Plaintiff attempts to satisfy this burden by suggesting that the Defendant's proffered reasons are pretextual or false.   *See id.* at 144.  The Plaintiff principally relies on the comparator evidence, already rejected.  The Court would not recount it. Secondarily, the Plaintiff emphasizes what she would characterize as a shifting explanation for her termination by the Defendant, but the Plaintiff has overstated the point. She contends that the Defendant is now alleging that she was terminated for violating HIPAA despite "its interrogatory responses (sic) that it 'did not terminate Plaintiff for violating

HIPAA.'" (Pl. Resp. at 16; Pl. Ex. W. at 12.) This is a misrepsentation of the record. The Defendant has indicated that while the Plaintiff's conduct did not violate HIPAA directly, it violated its own internal policy, which HIPAA mandates:

> 9. Please state with specificity, and exact reference to any federal statute, state statute, federal regulation, or state regulation, all grounds for the basis that allegedly having two patient armbands in a locked work locker on the appropriate hospital floor constitutes a violation of HIPAA.
>
> ANSWER: Defendant did not terminate Plaintiff for violating HIPAA, only it's policies on Confidentiality of Protected Health Information (PHI) (Policy No. 3) and HIPAA Privacy and Security Sanctions (Policy No. 7030-00-26), which were mandated by HIPAA . . . .

(Doc. No. 85-6 at 7.) Furthermore, the ECR clearly references the Plaintiff's violation of these policies as one of the bases for her termination. (Brannigan Dep., Ex. 2.) There has been no suspicious modification of the reason for termination, which might reasonably allow a jury to infer that the explanations were pretextual cover for discrimination.

The Court would address one other consideration. The Plaintiff was hired and fired by the same individual, Brannigan. This fact typically reduces the credibility of any allegations of discrimination. *See Proud v. Stone*, 945 F.2d 796, 797-98 (4th Cir. 1991) ("Employers who knowingly hire workers within a protected group seldom will be credible targets for charges of pretextual firing."); *see also Coghland v. Am. Seafoods Co.*, 413 F.3d 1090 (9th Cir. 2005) ("when the alleged discriminatory actor is someone who has previously selected the plaintiff for favorable treatment, that is very strong evidence that the actor holds no discriminatory animus.")

The Plaintiff's Title VII discrimination claim should not survive summary judgment.

## II. Hostile Work Environment

The Plaintiff also alleges she was subjected to a hostile work environment on the basis of her gender. Title VII makes it unlawful for an employer "to discriminate against any

individual . . . with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race [or] color . . . ." 42 U.S.C. § 2000e-2(a)(1). Since the environment of the workplace is a term or condition of employment, Title VII creates a hostile working environment cause of action. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 73 (1986); *EEOC v. R & R Ventures*, 244 F.3d 334, 338 (4th Cir. 2001).

To state a claim for hostile work environment, the plaintiff must show that: (1) the harassment was unwelcome; (2) the harassment was based on her race or national origin; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. *See Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003); *R & R Ventures*, 244 F.3d at 338; *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998); *Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 772 (4th Cir.1997). The Defendant contends that the Plaintiff cannot establish the third element of her claim.

The Plaintiff contends that the following actions created a hostile work environment on account of her race and national origin:

- Nicole Risher Ani allegedly made comments about the Plaintiff speaking "Hispanic slang" to patients (Pl. Dep. at 118);

- Ani stated that she hated people with accents, *id.*; and

- Brannigan called her on January 21, 2011, and told her that "no one liked her" and that she would have to "change." (Pl. Dep. at 79).

These disparate incidents do not amount to a cognizable claim in hostile work environment or harassment.

### *Severe or Pervasive*

The "severe or pervasive" element of a hostile work environment claim "has both subjective and objective components." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333 (4th Cir. 2003) (en banc); *see also Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183-84

19

(4th Cir. 2001)   First, the Plaintiff must show that she "subjectively perceive[d] the environment to be abusive." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993). Next, the Plaintiff must demonstrate that the conduct was such that "a reasonable person in the plaintiff's position" would have found the environment objectively hostile or abusive. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82 (1998).

As to the subjective element, it is generally established. (Pl. Dep. at 79, 118.)   As to the objective severity of the harassment, it "should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances,'" giving "careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Oncale*, 523 U.S. at 81; *see also Harris*, 510 U.S. at 23 (warning whether a hostile environment actually existed "can be determined only by looking at all the circumstances").   "There is no mathematically precise test" for determining when a hostile or abusive work environment exists. *Harris*, 510 U.S. at 22. The circumstances that should be considered include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with an employee's work performance. *Harris*, 510 U.S. at 23; *see also EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008). But, "'no single factor is' dispositive." *Sunbelt*, 521 F.3d at 315 (quoting *Harris*, 510 U.S. at 23).

In order to be actionable, the harassing "conduct must be [so] extreme [as] to amount to a change in the terms and conditions of employment." *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).  The Fourth Circuit has "recognized that plaintiffs must clear a high bar in order to satisfy the severe or pervasive test." *Id.*  It has stated, therefore, that the "task then on summary judgment is to identify situations that a reasonable jury might find . . . instances where the environment was pervaded with discriminatory conduct 'aimed to humiliate, ridicule, or intimidate,' thereby creating an

20

abusive atmosphere." *Id.* (quoting *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007)). Of course, "whether harassment was sufficiently severe or pervasive to create a hostile work environment is 'quintessentially a question of fact' for the jury." *Conner v. Schrader-Bridgeport Int'l, Inc.*, 227 F.3d 179, 199-200 (4th Cir. 2000) (quoting *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 243 (4th Cir. 2000))**.**

The Plaintiff's evidence of harassment fails essentially every consideration. The incidents were infrequent. While potentially offensive, they were neither physically threatening or humiliating. *See Harris*, 510 U.S. at 23. The first of the two incidents, attributed to Nicole Risher [Ani], allegedly occurred several months apart (summer of 2010/December 2010) and consisted of nothing more than alleged verbal statements. Both incidents occurred during a shift change when the Plaintiff was taking report. (Pl. Dep. at 118-119, 140-145) Risher [Ani] was not the Plaintiff's supervisor, but served as the charge nurse during the only shift the two worked together. (Pl. Dep. at 135-136.)

The alleged incident involving Brannigan has been uncomfortably overstated by the Plaintiff. Nothing in the Plaintiff's account of the conversation suggests that Brannigan meant anything racist or discriminatory by her call. (Pl. Dep. at 78-80.) All of the racial and ethnic connotations relating to it are attributable to the Plaintiff alone. *Id.* In the preamble to her brief (Pl. Resp. at 1), the Plaintiff, maybe as an inadvertent function of the use of the ambiguous pronoun, "she," implies that Brannigan may have used the words "Chile" and "culture" in the conversation. Only Plaintiff did. (Pl. Dep. at 84.) The fact that Brannigan so directly told the Plaintiff that co-workers did not like her, whether accurate or not, is beyond the scope of discrimination laws. The Plaintiff is neither entitled to be liked nor shielded from the knowledge of such dislike. Said even more directly, if Brannigan whole-cloth fabricated the allegation and said so with malice, the allegation is not actionable. There are no discriminatory circumstances.

21

The Plaintiff's evidence fails to show race and national origin discrimination and it cannot withstand summary judgment.

### III.    ADA Discrimination Claim

The Plaintiff also contends that she was discriminated against on account of her actual disability. The ADA prohibits an employer from discriminating "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a).  In general, a plaintiff seeking recovery for violation of the ADA must allege that (1) she has a disability, (2) she is otherwise qualified to receive the benefits of a public service, program, or activity, and (3) she was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of her disability. *Baird v. Rose*, 192 F.3d 462, 467-70 (4th Cir.1999).

The term "disability" means, with respect to an individual: (1) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment. 42 U.S.C. § 12102(1). Under the ADA, a plaintiff meets the requirement of "'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A); *Hilton v. Wright*, 673 F.3d 120, 128 (2d Cir. 2012). An employee who is not even disabled is still afforded the protections of the ADA if the employer perceives her to be disabled and discriminated against her due to its false belief. *Id.* In other words, no longer does a plaintiff have to prove that her employer perceives her impairment as limiting a major life activity. *Id.* Under the new Act, it matters not whether the plaintiff's impairment limited any of her major life activities. If a plaintiff has an impairment – real or perceived – she is entitled to protection. *Id.*

The Plaintiff, here, has argued both an actual disability of asymmetric sensorineural hearing loss, tinnitus, vertigo, and cochlear hydrops (an early from of Meniere's disease). (Pl. Ex. T) and a perceived substance abuse disability. Although a plaintiff may establish a disability discrimination claim through direct or indirect proof, the Plaintiff, here, has only made recourse to the *McDonnell Douglas* scheme of proof, properly employable in ADA cases. *See Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006); *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio*, 53 F.3d 55, 57–58 (4th Cir.1995).

To establish a *prima facie* case of disability discrimination under the ADA, a plaintiff must show that: (1) she is disabled; (2) she was discharged; (3) at the time of the discharge, she was performing her job at a level that met her employer's legitimate expectations; and (4) her discharge occurred under circumstances that raised a reasonable inference of unlawful discrimination. *Ennis*, 53 F.3d at 58. The parties debate the first element significantly, whether the Plaintiff has any disability, actual or perceived. The Court would not resolve it. For all the reasons stated above, even if a *prima facie* case could be established, the Plaintiff has not established that the legitimate, non-discriminatory reasons for termination are somehow pretextual. Her argument relating to the ADA claim in this respect is not any more illuminating.

## IV.    Title VII Retaliation Claim

The Plaintiff has also pled a Title VII retaliation claim. Under Title VII, it is an "unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). It is axiomatic that, before filing suit under Title VII, a plaintiff must first exhaust her administrative remedies by bringing a timely charge of discrimination with the EEOC. *See* 42 U.S.C. § 2000e-5(e)*; Gilliam v. S.C. Dep't of Juvenile Justice*, 474 F.3d 134, 139 (4th Cir. 2007); *Smith v. First Union Nat. Bank*, 202 F.3d 234, 247 (4th Cir. 2000).

But, the Plaintiff has not exhausted any Title VII retaliation claim. Her Charge reads as follows:

> I believe that I have been discriminated against because of my national origin, Chilean, in violation of Title VII of the Civil Rights Act of 1964, as amended. I also believe that *I have been discriminated against because of my disability, and in retaliation for opposing unlawful employment practices*, in violation of the Americans with Disabilities Act of 1990, as amended.

(Amend. Comp., Ex. B (emphasis added).) A "race-based retaliation claim is neither reasonably related to the disability-based retaliation claim, nor would a reasonable investigation into the latter claim put [the employer] on notice of [the employee's] former claim." *Evans v. Larchmont Baptist Church Infant Care Ctr., Inc.*, 956 F. Supp. 2d 695, 703 (E.D. Va. July 8, 2013). Because the Plaintiff did not allege retaliation based on Title VII in her charge, and a reasonable investigation into her ADA retaliation claim would not put the Defendant on notice of the claim, she is precluded from pursuing it in this Court. *See id.*

## V.    State Law Claims

Having recommended dismissal of the Plaintiff's federal claims against the Defendant, the undersigned recommends declining to exercise jurisdiction over the state law claims the Plaintiff has pled against the Defendant. *See* 28 U.S.C. § 1367(c); *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); *Patterson v. City of Columbia*, 2003 WL 23901761, at *5 (D.S.C. Dec 29, 2003) ("Patterson has raised various state law claims against all Defendants. Because the federal claims must be dismissed, the court declines to exercise jurisdiction over the remaining state law claims."). They should be dismissed without prejudice for refiling in state court.

## CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, the undersigned recommends that the Defendant's motion for summary judgment (Doc. No. 77) be GRANTED as to Plaintiff's federal claims. The undersigned further recommends that the Court decline to exercise jurisdiction over Plaintiff's state law claims, and that the case be closed.

IT IS SO RECOMMENDED.

WALLACE W. DIXON
UNITED STATES MAGISTRATE JUDGE

August 6, 2014
Charleston, South Carolina

**The parties' attention is directed towards the important notice on the next page.**

25

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.** "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

**Robin L. Blume, Clerk**
**United States District Court**
**Post Office Box 835**
**Charleston, South Carolina 29402**

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).