## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | |
|---|---|
| Paula Young, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| CareAlliance Health Services d/b/a Roper | ) |
| St. Francis Healthcare, | ) |
| | ) |
| Defendant. | ) |
| | ) |

No. 2:12-2337-RMG

**ORDER**

This matter comes before the Court on the Report and Recommendation (R & R) of the

Magistrate Judge (Dkt. No. 91), recommending that Defendant's Motion for Summary Judgment

be granted with respect to Plaintiffs' federal claims and that the Court decline jurisdiction over

Plaintiff's state law claims. For the reasons stated below, the Court adopts only portions of the

R & R and grants in part and denies in part Defendant's motion.

## I. BACKGROUND[1]

Plaintiff was a registered nurse at Defendant's Bon Secours St. Francis Hospital location

in its Neuro-Spine Center. She was hired on May 9, 2010, and terminated in May of 2011.

Plaintiff received a "fully successful" rating on her 2010 performance review issued on January

23, 2011. However, in February of 2011 Plaintiff's narcotic administration practices were called

into question, and a subsequent audit and investigation revealed a number of incidents of

---

[1] The Magistrate Judge laid out the facts and evidence supporting them in the R & R, which neither party objected to and which the Court adopts. (Dkt. No. 91 at 1-5). The Court sees no need to repeat the details here and only gives a brief overview. The Court also adopts the facts related to Plaintiff's 2010 performance review delineated at page 10 of the R & R. To the extent that the Court considers additional facts in its analysis, such facts are explicitly stated in the Discussion section below.

mishandling narcotic medication and controlled substances during a six-week period. In conjunction with a drug test performed in March of 2011, an inventory of Plaintiff's locker revealed that she was in possession of two patient armbands that contained personal health information, which Defendant claims violates its internal HIPAA policy. Defendant cites these issues as well as other various job performance issues as its reasons for terminating Plaintiff. Plaintiff contends that she was suspended and eventually fired on account of her race and national origin and on account of her disability. Plaintiff's supervisor attempted to meet with her to terminate her in early April of 2011. However, Plaintiff's mother suffered a stroke, and Plaintiff left the country. Plaintiff was ultimately terminated by letter in May of 2011.

Plaintiff's Second Amended Complaint alleges ten causes of action: (1) Discrimination on the Basis of Race or National Origin, (2) Discrimination on the Basis of Disability, (3) Retaliation under Title VII, (4) Breach of Contract, (5) Violation of the South Carolina Payment of Wages Act, (6) Defamation, (7) False Imprisonment, (8) Abuse of Process, (9) Malicious Prosecution, and (10) Intentional Infliction of Emotional Distress. (Dkt. No. 25). The Court previously dismissed Plaintiff's claim of race discrimination and retaliation under the South Caroline Human Affairs Law, Plaintiff's breach of contract claim, and Plaintiff's claim for intentional infliction of emotional distress. (Dkt. No. 29). Defendant filed a motion for summary judgment as to all remaining claims. (Dkt. No. 77).

The Magistrate Judge recommended granting summary judgment as to Plaintiff's federal causes of action and declining jurisdiction over Plaintiff's state causes of action. (Dkt. No. 91). Both parties filed timely objections. (Dkt. Nos. 93, 94). Plaintiff contends that summary judgment should be denied on all causes of action. (Dkt. No. 94). Defendant objects to the

-2-

Magistrate Judge's recommendation to decline jurisdiction over state law claims and to the R & R's failure to address additional grounds for granting its motion for summary judgment on Plaintiff's retaliation claim. (Dkt. No. 93).

## II. LEGAL STANDARD

### A. Report & Recommendation

The Magistrate Judge makes only a recommendation to this Court. The recommendation has no presumptive weight, and the responsibility to make a final determination remains with the Court. *Mathews v. Weber*, 423 U.S. 261, 270–71 (1976). The Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1). This Court is charged with making a de novo determination of those portions of the R & R or specified proposed findings or recommendations to which objection is made. *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005) (quoting 28 U.S.C. § 636(b)(1)); *accord* Fed. R. Civ. P. 72(b).

As to portions of the R & R to which no specific objection has been made, this Court "must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Id.* (quoting Fed. R. Civ. P 72 advisory committee note). Moreover, in the absence of specific objections to the R & R, the Court need not give any explanation for adopting the Magistrate Judge's analysis and recommendation. *See Camby v. Davis*, 718 F.2d 198, 199-200 (4th Cir. 1983).

### B. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). Only material facts–those "that might affect the outcome of the suit under the governing law"–will preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine, "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

At the summary judgment stage, the court must "construe the evidence, and all reasonable inferences that may be drawn from such evidence, in the light most favorable to the nonmoving party." *Dash v. Mayweather*, 731 F.3d 303, 310 (4th Cir. 2013). However, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Id.* at 311.

## III. DISCUSSION

### A. Race/National Origin Discrimination

Plaintiff proceeds under a *McDonnell Douglas* analysis. To establish a prima facie case of racial discrimination, Plaintiff must show that (1) she was a member of a protected class; (2) that she suffered an adverse employment action; (3) that she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) other employees who are not members of the protected class were retained under

-4-

apparently similar circumstances.[2] *Harris v. Home Sales Co.*, 499 F. App'x 285, 291-92 (4th Cir. 2012); *Bryant v. Bell Atl. Maryland, Inc.*, 288 F.3d 124, 133 (4th Cir. 2002). Defendant contends that Plaintiff fails to meet the third and fourth prong.

### 1. Whether Plaintiff was meeting Defendant's legitimate expectations.

It is undisputed that Plaintiff received a "fully successful" rating on her 2010 performance review issued in January of 2011. It is also undisputed that after an incident on February 11, 2011,[3] an audit and investigation revealed a number of incidents related to the mishandling of narcotics and that Plaintiff's locker contained two patient armbands, which Defendant determined violated its internal HIPAA policy. Defendant claims that these incidents in 2011 are

---

[2] The Fourth Circuit has not been consistent in its statement of the fourth factor of a prima facie case for racial discrimination claim where an adverse employment action was taken. *Compare Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007) (stating that the fourth element is showing that "the position remained open or was filled by similarly qualified applicants outside the protected class") *with Bryant v. Bell Atl. Maryland, Inc.*, 288 F.3d 124, 133 (4th Cir. 2002) (stating that the fourth element is showing that "other employees who are not members of the protected class were retained under apparently similar circumstances") and *Taylor v. Virginia Union Univ.*, 193 F.3d 219, 234 (4th Cir.1999) (en banc) (providing a three-prong prima facie test involving comparators), *abrogated on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003); *but see Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 720 (4th Cir. 2013) ("[P]laintiff is not required as a matter of law to point to a similarly situated comparator in order to succeed on a discrimination claim.") (internal quotations omitted). Both the *Bryant* and *Holland* fourth factors require Plaintiff to show that her termination occurred under circumstances giving rise to an inference of discrimination, while *Laing* recognizes that other forms of evidence may be used to support a Plaintiff's claim of pretext.

The Magistrate Judge used the fourth element as described in *Bryant*, neither party has objected to this statement of the fourth element, and both parties have argued under it. Therefore, the Court will apply the fourth element as described in *Bryant*.

[3] On February 2011, night nursing supervisor, Debbie Dingler, assisted with the lumbar drain in one of Plaintiff's patients. Plaintiff allegedly responded inappropriately to a question relating to her administration of narcotic medication to the patient, and Dingler was so troubled that she requested an audit of Plaintiff's medication administration records and reported the incident to Plaintiff's direct supervisor. (Dkt. No. 91 at 2).

the reasons it terminated Plaintiff and relies on these incidents to support its motion for summary judgment on the third prong.

The Magistrate Judge found that "the Plaintiff, through a satisfactory 2010 review has certainly created some issue of fact as to the quality of her performance prior to the 2011 incidents." (Dkt. No. 91 at 12). He went on to find that if the 2011 performance accusations "are properly considerable, then the Plaintiff cannot establish the third element. . . . If, however, the Plaintiff's performance up to the point of her allegedly faltering performance in 2011 is only relevant, then the element is satisfied."[4] (*Id.*). The Magistrate Judge declined to determine whether the 2011 conduct should be considered but based his recommendation on the fourth element, addressed below.

The Fourth Circuit has held that, in evaluating the third prong of a prima facie case, courts can consider evidence of unsatisfactory job performance, even if the alleged deficient performance was the event that sparked the termination. *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 515-16 (4th Cir. 2006). Thus, the Court will consider the 2011 events under the third prong of a prima facie case. However, the Court disagrees that considering these events mandates summary judgment for Defendant. In *Warch*, the Fourth Circuit went on to note that the *McDonnell Douglas* inquiry was flexible and "meant only to aid courts and litigants in arranging the presentation of evidence." *Id.* at 517 (quoting *Watson v. Ft. Worth Bank & Trust*, 487 U.S. 977, 986 (1988)).

---

[4] Neither party objected to this finding, though Plaintiff attempts to construe the R & R as holding an issue of material fact exists as to the third element. (*See* Dkt. No. 94 at 3).

The *Warch* court was explicitly "cognizant of the danger that courts might apply the 'expectations' or 'qualification' element of the prima face too strictly in some cases, resulting in the premature dismissal of potentially meritorious claims of unlawful discrimination" and used the *Cline*[5] hypothetical to illustrate.

> In the *Cline* hypothetical, a truck driver who loses her driver's license is terminated. A narrow application of the "expectation" or "qualification" element would appear to foreclose the driver from proving her prima facie case, since with no driver's license she would not be able to show that she met the job qualifications or legitimate expectations of her employer for a position as truck driver. Yet, even though the driver's case would never get past the prima facie stage, the employer could have still used the loss of the license as a pretext for illegal discrimination. Evidence tending to show this pretext might be that similarly situated men who lost their licenses were not terminated but, instead, were temporarily suspended until they received new licenses or were transferred to other jobs within the company.

*Id.* at 516. The *Warch* court rejected *Cline*'s remedy to this problem, which was to look at whether an employee met her employer's legitimate expectations *prior* to the events that sparked termination. *Id.* However, the Fourth Circuit agreed that truck driver's claim should survive summary judgment. It reached the same result by holding that if a defendant's expectations were a "sham designed to hide the employer's discriminatory purpose," then the expectations were not "legitimate." *See id.* at 518 (quoting *Brummett v. Lee Enter., Inc.*, 284 F.3d 742, 745 (7th Cir.2002)); *accord McCallum v. Archstone Cmtys LLC*, No. JFM–12–01529, 2013 WL 5496837 at *8 (D. Md. Oct. 2, 2013). Applied to the *Cline* hypothetical, the plaintiff created an issue of fact as to whether the expectation of a driver's license was simply a "sham designed to hide the employer's discriminatory purpose" and, thus, created an issue of fact as to whether this expectation was "legitimate." *See id.* at 517.

---

[5] *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651 (6th Cir. 2000).

Here, as in the *Cline* hypothetical, Plaintiff has submitted evidence of a comparator that creates an issue of fact as to pretext. This same evidence creates an issue of fact as to whether the 2011 events–the stated reasons for Plaintiff's termination–were simply a "sham designed to hide the employer's discriminatory purpose," and, therefore, not "legitimate." *See Brown v. City of Columbia*, No. 3:10–2860, 2012 WL 3835389 at *3 n.3 (D.S.C. July 19, 2012) (citing *Warch* and addressing prima facie elements and pretext together where the employer's stated reason for terminating plaintiff was poor work performance), *adopted by* 2012 WL 3838109 (D.S.C. Sept. 4, 2012). Therefore, summary judgment is not appropriate on the third prong of Plaintiff's prima facie case.

### 2. Whether Plaintiff has identified a proper comparator

To meet the fourth element of her prima facie case, Plaintiff identifies Kimberly Harrelson as a comparator. The Magistrate Judge found that Harrelson was not a proper comparator and that Plaintiff, therefore, failed to create an issue of fact as to the fourth element of the prima facie case or as to pretext. (Dkt. No. 91 at 16). Plaintiff objects to this finding. (Dkt. No. 94).

Plaintiffs must show that "they are similar in all relevant respects to their comparator." *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010). "Such a showing would include evidence that the employees 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Id.* (*quoting Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir.1992)); *accord Ward v. City of North Myrtle Beach*, 457 F. Supp. 2d 625, 643 (D.S.C. 2006).

-8-

Such comparisons "will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstances." *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir.1993). However, a plaintiff can only draw a comparison where "discipline [is] imposed for like offenses." *Id.*; *see also Lightner v. City of Wilmington, N.C.*, 545 F.3d 260, 265 (4th Cir. 2008) ("The similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful."). "In determining whether a plaintiff's misconduct is comparable in seriousness to that of employees outside the protected class, a court should consider 'the gravity of the offenses on a relative scale.'" *Charlot v. Donley*, No. 3:11–00579, 2013 WL 1339594 at \*4 (D.S.C. Mar. 29, 2013) (quoting *Moore v. City of Charlotte*, 754 F.2d 1100, 1107 (4th Cir. 1985)).

Harrelson is a white female of non-Hispanic and non-Chilean descent. Plaintiff and Harrelson held the same position, both were supervised by Brannigan, and both were subject to the same standards. (Dkt. No. 91 at 13). They were also the only two Registered Nurses working on the Neurospine floor seventy percent (70%) of the time. (*Id.*).[6] Thus, the only question is whether Harrelson engaged in sufficiently similar conduct.

The Employee Conference Record, ultimately sent to Plaintiff by mail with a termination letter, lists the following misconduct or job deficiencies:

(1) Multiple incidents involving medication administration:

(a) four instances of missing or unaccounted for doses of narcotic medication;

(b) one instance of erroneous documentation of administration of narcotic medication;

---

[6] These facts are taken from the R & R. No party has objected to these particular facts or contradicted them in objections to the R & R.

(c) four instances of delayed return and/or wasting of narcotic medication;

(d) three instances of administration of narcotic pain mediation without
documentation of the patient's condition required by the Defendant's Pain
Management Policy;[7]

(2) Two patient armbands containing personal health information were found in
Plaintiff's locker, which Defendant claims was a violation of its internal HIPAA policies;

(3) Plaintiff "put the unit into a critical situation" by leaving the only set of keys to
PCA machines in her locker when she went home;

(4) multiple complaints by coworkers, physicians and other personnel about Plaintiff's
inability to work independently, poor organizational skills, inability to effectively
communication pertinent patient information to the next shift nurses or to physicians,
inability to finish her work during shift hours, and visible frustration and lack of
confidence while on the job;

(5) Plaintiff did not properly respond to a Rapid Response Team call;

(6) Plaintiff did not properly notify a physician of a patient's increased temperature as
ordered on admission orders.

(Dkt. No. 77-8 at 17-21).

Harrelson also had "disorganization on the clinical side with taking care of patients," had

trouble getting her work done and had "sloppy medication administration practice." (Dkt. No. 84

at 10-12). In particular, Harrelson "wasted"[8] medications inappropriately. (*Id.* at 15). Harrelson

also had severe absenteeism problems, received complaints that she openly displayed frustration

_____

[7] Neither party objected to these characterizations of the listed incidents by the Magistrate
Judge.

[8] Per hospital policy, certain medications are secured in Pyxis, an automated medication
dispensing system. If medication is removed from Pyxis and not given in a timely manner, the
medication must be "wasted," or disposed of properly according to policy. (R & R, Dkt. No. 91
at 14 n.2 (citing to the record)).

on the job, and failed to conduct a pain reassessment after an intervention was performed. (Dkt.

No. 85-1).

The Magistrate Judge found that, "[i]t is a close call whether Harrelson should be

considered as similarly situated and a relevant comparator." (Dkt. No. 91 at 16). He went on to

state that

> There is a substantial degree of overlap in the admitted conduct, including
> undisputed incidences of medication wasting, poor documentation, and other
> generalized performance issues. Notwithstanding, there are two glaring
> distinctions in the performance portfolios of the Plaintiff and Harrelson, namely
> the four instances of missing and unaccounted for narcotics . . . and two patient
> armbands found in the Plaintiff's locker, which constituted a violation of the
> Defendant's HIPAA policy.

(Dkt. No. 91 at 61). The Magistrate Judge found that, given these two additional acts of

misconduct, "allowing a jury to use Harrelson as a barometer of measure against the Defendant's

conduct would be a step too far." (*Id.*).

The Court disagrees. While the offenses at issue are not exactly the same, there is

substantial overlap, and an exact overlap is not required. Just like unaccounted for narcotics, not

properly disposing of (or "wasting") narcotics raises the concern that narcotics are being

diverted. The Court finds these two offenses sufficiently similar to send the matter to a jury.

While Harrelson did not also violate company policy by having patient armbands in her locker, it

is too much to expect that a comparator will have the exact same list of offenses.

In the context of race-based peremptory strikes of jurors, the Supreme Court held that a

rule requiring individuals to be exactly identical would make claims of discrimination

"inoperable" because "potential jurors are not products of a set of cookie cutters." *Miller-El v.*

*Dretke*, 545 U.S. 231, 247 n.6 (2005). The Sixth Circuit has held that this reasoning applies with

-11-

equal force to the employment-discrimination context. *Wright v. Murray Guard, Inc.* 455 F.3d 702, 710 (6th 2006). And this Court agrees. The Court finds that offenses involving the possible diversion of narcotics are at least as serious as having confidential patient information locked in a nurse's locker where third parties cannot access it. Under these circumstances, whether a comparator is similarly situated is left to the jury. *See Coleman v. Donahoe*, 667 F.3d 835, 846-47 (7th Cir. 2012). Thus, the Court finds that Plaintiff has made a prima facie case of discrimination.

### 3. Legitimate, Non-Discriminatory Reason

Neither party objects to the Magistrate Judge's finding that Defendant has put forward legitimate, non-discriminatory reasons for Plaintiff's termination. This Court agrees that the Defendant has done so. Specifically, Defendant has identified the reasons listed in the Employee Conference Record.

### 4. Pretext

Once an employer has identified a legitimate, non-discriminatory reason for its employment action, "the burden shifts back to the employee to show that the given reason was just a pretext for discrimination." *E.g, Evans v. Tech. Apps. & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996). Comparator evidence is "'especially relevant' to a showing of pretext." *Laing v. Federal. Exp. Corp.*, 703 F.3d 713, 719 (4th Cir. 2013) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973)). Valid comparator evidence, like that presented here, is generally enough to create an issue of fact for the jury. *Id.* at 719-20

However, Defendant has raised the "same actor" inference, and the Magistrate Judge held that this inference applied. The Magistrate Judge's conclusion that Plaintiff had failed to create an issue of pretext was not based solely on the existence of the same actor inference, but was bolstered by it. (Dkt. No. 91 at 18). Therefore, the Court address the inference and whether it mandates summary judgment under the circumstances present here.

The Fourth Circuit has recognized a "strong inference that discrimination was not a determining factor in a discharge decision when (1) the person who hired the plaintiff knew of the plaintiff's protected condition when the hiring decision was made, (2) the person who hired the plaintiff also fires him (3) within a relatively short time span following the hiring, and (4) the employer advances a legitimate and nondiscriminatory reason for the discharge." *Adams v. Greenbrier Oldsmobile/GMC/ Volkswagen, Inc.*, 172 F.3d 43 (table decision), 1999 WL 34907 at *5 (4th Cir. 1999).

"The relevance of the fact that the employee was hired and fired by the same person within a relatively short time span comes at the third stage of the [*McDonnell Douglas*] analysis." *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991). While this fact creates "a strong inference that the employer's stated reason for acting against the employee is not pretextual," the plaintiff "still has the opportunity to present countervailing evidence of pretext." *Id.*

Plaintiff objects to the Magistrate Judge's finding that this "same actor" inference applies. First, Plaintiff argues that individuals other than Brannigan were involved in the decisions to hire and fire Plaintiff. (Dkt. No. 94 at 11). Brannigan testified that a peer interview team provided their preferences on who to hire but that she made the final decision. (Dkt. No. 77-8 at 2). Brannigan as well as Penny Peralta (Brannigan's supervisor and Vice President of Nursing) and

Nancy Inabinett (Human Resources officer) were "involved in the decision to fire Paula Young." (Dkt. No. 84 at 24). Defendant has pointed to evidence that the idea of termination originated with Brannigan (*see* Dkt. No. 96 at 15), but it is not clear from the record before the Court who made the final decision to terminate Brannigan. This ambiguity raises a question of fact as to whether the inference should apply *See Burgess v. Bowen*, 466 F. App'x 272, 280 n.4 (4th Cir. 2012) ("Viewed in the light most favorable to [plaintiff], the evidence presents a genuine issue of fact as to who made the decision to terminate [plaintiff], and thus whether the same actor inference should apply."). Furthermore, at least one district court in the Fourth Circuit has found that the influence of others is relevant to whether the same actor inference applies. *See Hoffman v. Baltimore Police Dep't*, No. WMN–04–3072, 2009 WL 167144 at *14 (D. Md. Jan. 21, 2009) ("[W]hile Zollicoffer technically may have had authority as the 'sole' decision maker, the record does not support the conclusion that, in making his decision, he was immune from the influence of others.").

Even if the inference does apply, Plaintiff "still has the opportunity to present countervailing evidence of pretext." *Proud*, 945 F.2d at 798. Here, Plaintiff has presented comparator evidence, which the Fourth Circuit has recently held to be "a particularly probative means for discerning whether a given adverse action was the product of a discriminatory motive." *Laing*, 703 F.3d at 719. The Court finds that the lack of information on who made the final decision to terminate Plaintiff combined with probative comparator evidence is enough to preclude summary judgment. *See Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 573-74 (6th Cir. 2003) ("[W]here . . . the factfinder decides to draw the same-actor inference, it is insufficient to warrant summary judgment for the defendant if the employee has otherwise raised

-14-

a genuine issue of material fact."); *see also Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1183 (10th Cir. 2006) ("'[S]ame actor' evidence gives rise to an inference, rather than a presumption, that no discriminatory animus motivated the employer's actions."). Therefore, the Court denies summary judgment as to Plaintiff's claim of discrimination based on race or national origin.

## B. ADA Discrimination Claim

Plaintiff also claims that she was terminated because of her disability. The Magistrate Judge found that Plaintiff could not create an issue of fact regarding pretext. (Dkt. No. 91 at 23). This Court agrees that Plaintiff has failed to put forward evidence from which a reasonable jury could conclude she was terminated based on an actual or perceived disability.

Plaintiff's comparator evidence does not help her survive summary judgment on her ADA claim. First, Harrelson was admittedly disabled–she had depression apparently related to the relatively recent birth of a child, was placed on FMLA leave and was going to see a psychologist. (Dkt. No. 77-8 at 14). Plaintiff argues that Harrelson's depression developed after Plaintiff's termination so she is a proper comparator because Harrelson had "no disability, actual or apparent, at any point during Young's employment." (Dkt. No. 83 at 25). However, the misconduct which makes Harrelson a comparator also occurred after Plaintiff's termination. Other than absenteeism and the fact that, after 7 days on the job under an orienting nurse in 2005, Harrelson had not yet shown adequate progression toward "independently providing care for her patient assignment," all of Harrelson's misconduct occurred after Plaintiff was terminated. (Dkt. No. 85-1; Dkt. No. 84 at 7). Specifically, Harrelson's misconduct regarding medication administration practice, *which is essential to Plaintiff's comparator analysis*, occurred after

-15-

Plaintiff was terminated and in 2012, when Plaintiff concedes Harrelson's depression developed. (Dkt. No. 84 at 6-9).

Furthermore, to the extent Plaintiff claims Defendant discriminated against her based on a perceived disability of substance abuse,[9] Plaintiff has gone out of her way to point to evidence that Defendant perceived Harrelson as having a substance abuse problem. (*See* Dkt. No. 94 at 7). While this evidence may help her race discrimination claim, it undercuts her ADA claim and leads to the inference that Plaintiff's treatment was *not* due a perceived substance abuse problem.

Plaintiff has not put forward a non-disabled comparator who received more favorable treatment than she did. Nor has she put forward any other evidence that raises an inference that she was terminated for a perceived or actual disability. Plaintiff contends that having her drug tested and sent home in cab creates an inference that she was fired for current substance abuse. (Dkt. No. 82 at 25). However, as explained above *current* drug use is not a protected disability. Plaintiff has provided no evidence that she was terminated for an addiction not involving current drug use. The only circumstances that Plaintiff puts forward as evidence that raises an inference of unlawful discrimination as to her hearing loss is that Brannigan singled Plaintiff out for

---

[9] The Court also notes that the *behavior* of *current* substance abuse is not a protected disability. The Fourth Circuit and others have held that *drug addiction* and *alcoholism* constitute an impairment under the ADA. *A Helping Hand, LLC v. Baltimore Cty, MD*, 515 F.3d 356, 367 (4th Cir. 2008). However, the distinction between a drug addiction and current illicit drug use is an important one. A drug addict or alcoholic may have received treatment and may not be currently using the substance(s) to which she is addicted. As the Fourth Circuit explained in the Fair Housing Act context, Congress intended to treat drug addiction as a significant impairment but excluded protection for "*current*, illegal use of or addiction to a controlled substance." *United States v. S. Mgmt. Corp.*, 955 F.2d 914, 919 (4th Cir. 1992) (emphasis added). Congress has also explicitly excluded protection under the ADA for individuals engaged in the *current* use of illegal drugs. "[A] qualified individual with a disability shall not include any employee or applicant who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use." 42 U.S.C. § 12114(a).

-16-

shadowing, while other non-disabled coworkers were not singled out. (Dkt. No. 83 at 25). However, Plaintiff merely makes this conclusory statement in brief. Plaintiff has not pointed to a non-disabled coworker about whom Brannigan received similar complaints but who Brannigan did not shadow. The Court finds that Plaintiff has failed to create an issue of fact as to whether her discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination[10] and failed to create an issue of fact as to pretext. Therefore, the Court grants summary judgment on Plaintiff's ADA claim.

## C. Hostile Work Environment

To establish a hostile work environment claim, Plaintiff must show that the offending conduct was: (1) unwelcome; (2) based on her race; (3) sufficiently severe or pervasive to alter the conditions of her employment and create an abusive atmosphere; and (4) imputable to the defendant. *EEOC v. Central Wholesalers, Inc.*, 573 F.3d 167, 175 (4th Cir. 2009). Defendant claims that Plaintiff cannot create an issue of fact as to the third or fourth element of her claim. (Dkt. No. 77-1 at 10-13). The Magistrate Judge found that Plaintiff failed to create an issue of fact as to the third element. (Dkt. No. 91 at 19-21). The Court agrees with the Magistrate Judge in so far as the incidents raised before him. However, Plaintiff raises additional incidents in her objections to the R & R that the Court must consider, and the Court finds that these events create an issue of fact on the third prong.

---

[10]To establish a prima facie case of discrimination in the ADA context, a Plaintiff must show that "(1) she was in the protected class; (2) she was discharged; (3) at the time of the discharge, she was performing her job at a level that met her employer's legitimate expectations; and (4) her discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination." *E.g., Fields v. Verizon Servs. Corp.*, 493 F. App'x 371, 375 n.4 (4th Cir. 2010); *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995).

"The 'severe or pervasive' element of a hostile work environment claim 'has both subjective and objective components.'" *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) (quoting *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333 (4th Cir. 2003) (en banc)). "[W]hen determining whether the harassing conduct was objectively severe or pervasive, we must look at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (internal quotations omitted). No single factor is dispositive. *Id.* "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotations and citations omitted).

Thus, the Court's task on summary judgment is "to identify situations that a reasonable jury might find to be so out of the ordinary as to meet the severe or pervasive criterion. That is, instances where the environment was pervaded with discriminatory conduct aimed to humiliate, ridicule, or intimidate, thereby creating an abusive atmosphere." *Sunbelt*, 521 F.3d at 316.

Plaintiff puts forward two incidents where Nicole Risher Ani allegedly made comments that could be interpreted by a jury as unwelcome harassment based on her race. Plaintiff testifies that in the summer of 2010, Ani was complaining about a patient's wife and when Plaintiff asked why, Ani responded that "I'm sure you and her talk your Hispanic slang." (Dkt. No. 83-2 at 140-41). In December of 2010, Ani remarked that "I hate people with accents." (*Id.* at 142).

The Court agrees with the Magistrate Judge that a reasonably jury could not find that these two incidents approximately six months apart were "sufficiently severe or pervasive to alter

-18-

the conditions of her employment and create an abusive atmosphere." This conduct is not frequent. The incidents are "mere offensive utterances" rather than physically threatening or humiliating. There is no evidence that these comments interfered with Plaintiff's work performance. Therefore, these two incidents are not enough for Plaintiff's claim to survive. *See, e.g., Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 773 (4th Cir. 1997) (affirming the entry of summary judgment for the employer where, over a three-month period, the female plaintiff's male co-workers made the following comments: (1) that the male employees had made every female employee "cry like a baby" and would do the same to her; (2) that more "buxom" women were needed at the office; (3) asking the plaintiff if she would become a "mini van driving mommy;" and (4) that plaintiff should go home to "fetch [her] husband's slippers like a good little wife."); *Skipper v. Giant Food, Inc.*, 68 F. App'x. 393, 398 (4th Cir. 2003) (finding manager who harassed plaintiff by following him around and referring to him by a racial slur on one occasion, coupled with daily exposure to racist graffiti and the Plaintiff overhearing other employees use the same slur thirteen times in a four year period insufficient to preclude summary judgment).

Plaintiff also puts forward a conversation with Brannigan, her supervisor, where Brannigan told her that "no one liked her" and she would have to "change." (Dkt. No. 83-2 at 78). Plaintiff complains that she "cannot understand how somebody, as a manager, called you on the phone, after you work 12 hours, and tell you [that] on the phone." (*Id.* at 79). The Court agrees with the Magistrate Judge that there is no evidence whatsoever that these comments were based on race.[11] As the Magistrate Judge stated, "Plaintiff is neither entitled to be liked nor

---

[11] No party objected to this particular finding.

shielded from the knowledge of such dislike" by anti-discrimination laws. (Dkt. No. 91 at 21).

Thus, this incident does not change the outcome of Plaintiff's claim. *See Harsell*, 123 F.3d at

771 (dismissing out-of-hand several allegedly offensive comments not related to the plaintiff's

gender and not considering them when determining whether the remaining behavior was

sufficiently severe or pervasive).

Plaintiff does not object to the Magistrate Judge's finding that these three instances fail to

create an issue of fact on her hostile work environment claim, but objects that the Magistrate

Judge did not consider the events of March 18, 2011, where Plaintiff was accused of diverting

patient medication, underwent a drug screen, was escorted out of the hospital by security guards

and not allowed to drive her own vehicle, but forced her to have to take a cab.[12] (Dkt. No. 94 at

14-15). The Magistrate did not consider these events because Plaintiff never raised them before

the Magistrate Judge. (*See* Dkt. No. 83 at 18-19). Nevertheless, the Court must consider the

argument that they create an issue of fact as to Plaintiff's hostile work environment claim. *See*

*United States v. George*, 971 F.2d 1113, 1118 (4th Cir. 1992) (When a proper objection is made

to a particular issue, "a district court is required to consider all arguments directed to that issue,

regardless of whether they were raised before the magistrate.").

Defendant argues that nothing about these events suggest that they were due to race.

(Dkt. No. 96 at 18). However, Plaintiff's comparator evidence allows a jury to infer that these

---

[12] Plaintiff also raises the fact that Plaintiff was later accused of a patient confidentiality
violation for having patient armbands in her locker. (Dkt. No. 94 at 14-15). However, this
incident cannot contribute to a hostile work environment because it occurred while she was on
leave without pay and not while Plaintiff was at the workplace. *See Pueschel v. Peters*, 577 F.3d
558, 565-66 (4th Cir. 2009) (holding conduct that occurred while Plaintiff was on leave without
pay could not contribute to a hostile work environment because it occurred after she left the
workplace).

actions were based on Plaintiff's race. Harrelson was not required to take a drug test, escorted from the premises by security guards, or forced to take a taxi home. The Court finds that, viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that the events of March 18, 2011, were "so out of the ordinary as to meet the severe or pervasive criterion," that these events were "aimed to humiliate, ridicule, or intimidate." *Sunbelt*, 521 F.3d at 316. Because it was Brannigan, Plaintiff's supervisor, that subjected her to this treatment on March 18, 2011, (Dkt. No. 77-7 at 42-43), and these actions "culminate[d] in a tangible employment action," Defendant is strictly liable under the fourth prong. *Vance v. Ball State Un.*, 133 S.Ct. 2434, 2439 (2013). Therefore, the Court denies summary judgment as to Plaintiff's hostile work environment claim.

## D. Retaliation Claim

### 1. Exhaustion

The Magistrate Judge found that Plaintiff had not exhausted her administrative remedies for a Title VII retaliation claim because she only raised a disability-based retaliation claim in her EEOC Charge. (Dkt. No. 91 at 24). The Court disagrees.

In any subsequent lawsuit alleging unlawful employment practices under Title VII, a federal court may only consider those allegations included in the EEOC charge."[13] *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 407 (4th Cir. 2013). This EEOC charge "defines the scope of her subsequent right to institute a civil suit" and she may only advance claims that are "reasonably related to her EEOC charge and can be expected to follow from a reasonable

_____

[13] In determining what claims a plaintiff has properly alleged before the EEOC, a court may only look to the charge and not to the intake questionnaire or other documents sent to the EEOC. *Id.* at 408.

-21-

administrative investigation." *Smith v. First Union Nat'l. Bank*, 202 F.3d 234, 247 (4th Cir.

2000). However, because lawyers do not typically complete the administrative charges, courts

construe them liberally. *Chacko v. Patuxent Inst.*, 429 F.3d 505, 509 (4th Cir. 2005).

In determining whether a claim has been raised, a court focuses on the factual allegations

made in the EEOC charge. *See Chacko*, 429 F.3d at 509 ("Our cases make clear that the *factual*

allegations made in formal litigation must correspond to those set forth in the administrative

charge.") (emphasis added). "[I]f the factual allegations in the administrative charge are

reasonably related to the factual allegations in the formal litigation, the connection between the

charge and the claim is sufficient." *Id.*

Here, Plaintiff's EEOC Charge states:

I.      I was hired by the above named employer on May 10, 2010, as a Clinical
        Nurse. I met the standards for this position. During my employment,
        Supervisor, Ms. Risher, made comments about me speaking to a patient
        and stated, "I'm sure you and her talk your Hispanic slang," and "I hate
        people with accents!" On January 11, 2011, I was harassed by my
        immediate supervisor, Cathy Brannigan. She stated that no one liked
        working with me and asked if I had problems. On March 18, 2011, I was
        wrongly accused, in front of my co-workers, of diverting drugs from my
        patients, and was forced to take a drug test. I was removed of my badge
        and sent home. On March 22, 2011, I was informed that I was on leave
        without pay, for an indefinite time. On March 28, 2011, I was called to a
        meeting with Ms. Brannigan and a Privacy Officer (name unknown), and
        told I was being investigated. On April 1, 2011, I reported these incidents
        to Human Resources.

II.     The Privacy Officer said that I was being investigated for a HIPAA
        violation. No other reasons were given for the discriminatory actions
        described above.

III.    I believe that I have been discriminated against because of my national
        origin, Chilean, in violation of Title VII of the Civil Rights Act of 1964, as
        amended. I also believe I have been discriminated against because of my

-22-

disability, and in retaliation for opposing unlawful employment practices,
in violation of the Americans with Disabilities Act of 1990, as amended.

(Dkt. No. 25-2). While the Court agrees with the Magistrate Judge that the third paragraph of

this charge only references retaliation in violation of the ADA, that is not the end of the Court's

inquiry. The Court must determine whether Plaintiff's Title VII retaliation claim is "reasonably

related" to the EEOC charge "and can be expected to follow from a reasonable administrative

investigation" of that charge. *See Sydnor v. Fairfax County, Va.*, 681 F.3d 591, 594 (4th Cir.

2012) ("[S]o long as a plaintiff's claims in her judicial complaint are reasonably related to her

EEOC charge and can be expected to follow from a reasonable administrative investigation, she

may advance such claims in her subsequent civil suit.") (internal quotes omitted).

    As Defendant notes, the only factual allegation pertaining to protected activity that could

form the basis of a retaliation claim is the April 1, 2011, letter. (Dkt. No. 96 at 21). It is

undisputed that this letter does not mention a disability but only claims that Plaintiff was

discriminated against based on her race or national origin. (*See* Dkt. No. 88-1 at 18). Plaintiff's

Title VII retaliation claim that she was terminated for submitting the April 1, 2011 letter can be

expected to follow from a reasonable investigation of Plaintiff's factual allegations. *See Bonds v.

Leavitt*, 629 F.3d 360, 379-80 (4th Cir. 2011) (holding that, despite the fact that the EEOC

charge did not mention the CSRA, EEOC charge adequately exhausted Plaintiff's administrative

remedy as to her CSRA claim because it was "firmly grounded" in the factual allegation that "I

was notified that I would be fired . . . after I was accused of doing something that I did not do");

*Josey v. Wal-Mart Stores East, L.P.*, No. 0:11–2993, 2013 WL 5566035 at *5 (D.S.C. Oct. 8,

2013) (holding race discrimination claim was exhausted when the EEOC charge contained the

-23-

factual allegation that "a white employee was provided an accommodation and was not harassed" even though race was not mentioned in the description of the alleged discrimination and the "race" box was not checked), *aff'd by* 566 F. App'x 209 (4th Cir. 2014). Therefore, the Court finds that Plaintiff's retaliation claim is exhausted.

### 2. Prima Facie Case

In order to establish a prima facie claim of retaliation in violation of Title VII, a plaintiff must show that "1) the employee engaged in protected activity; 2) the employer took adverse employment action against the employee; and 3) a causal connection existed between the protected activity and the adverse action." *Munday v. Waste Mgmt. of North Am., Inc.*, 126 F.3d 239, 242 (4th Cir. 1997). "The employer may then rebut the prima facie case . . .by showing that there was a legitimate non-discriminatory reason for the adverse action . . . after which the burden shifts back to the plaintiff to show that those reasons are pretextual." *Id.* (internal citations omitted).

The parties agree that Plaintiff engaged in two protected activities: her letter of April 1, 2011, and the filing of a charge of discrimination. (Dkt. No. 96 at 23). Plaintiff's act of retaining an attorney is also a protected activity.[14] *See Connell v. Bank of Boston*, 924 F.2d 1169, 1179 (1st Cir. 1991). It is undisputed that Plaintiff was terminated and was reported to the state

---

[14] The Court finds that Plaintiff's conversation with Ani in December of 2010 and Plaintiff's telephone conversation with Brannigan in January of 2011 were not protected activity. Complaining to one's co-workers about unlawful employment practices constitutes protected activity, as long as those comments are passed on to management. *Neiderlander v. Am. Video Glass Co.*, 80 F. App'x 256, 260-61 (3d. Cir. 2003); *Mondaine v. Am. Drug Stores, Inc.,* 408 F. Supp. 2d 1169, 1190 (D. Kan. 2006). However, while related to race, neither of these conversations included complaints about discrimination or other unlawful employment practices.

nursing board, which satisfies the second prong.[15] (Dkt. No. 96 at 29). Close temporal proximity between the protected act and the adverse employment action, which is undisputably present here, is sufficient to establish the third prong. *Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 845 (2d. Cir. 2013) ("[T]he but-for causation standard does not alter the plaintiff's ability to demonstrate causation at the prima facie stage on summary judgment or at trial indirectly through temporal proximity."); *Adams v. City of Montgomery,* 569 F. App'x 769, 773 (11th Cir. 2014); *Clark v. Jackson Hosp. & Clinic, Inc.*, No. 2:12–CV–836, 2013 WL 5347450 at * 5 (M.D. Ala. Sept. 23, 2013).

### 3. Pretext

Relying on *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013), Defendant argues Plaintiff cannot create an issue of fact on whether Plaintiff's protected activity was the "but-for" cause of her termination and the report to the state nursing board. In *Nassar*, the Supreme Court held that to prevail on a Title VII retaliation claim, a plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Id.* at 2534. Showing that retaliation was one of the employer's motives, even a substantial one, is not sufficient. *Id.* (overturning substantial motivating factor standard). However, this standard "does not require proof that retaliation was the *only* cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 846 (2d. Cir. 2013) (emphasis added).

_____

[15] Because the first protected conduct in which Plaintiff engaged occurred on March 20, 2011, (informing Defendant she had retained an attorney), only alleged retaliatory acts after this date are relevant to Plaintiff's claim. The Court also agrees with Defendant that informing Plaintiff it had inadvertently neglected to pay her WOW pay and paying such wages does not constitute retaliatory conduct.

To survive summary judgment, Plaintiff must present evidence from which a reasonable jury could conclude that Defendant terminated her or reported her to the state nursing board because of the April 1, 2011 letter, her EEOC charge or her retention of an attorney and would not have terminated or reported her otherwise. *See, e.g.*, *Zann Kwan*, 737 F.3d at 846; *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 643 (7th Cir. 2013); *Rattigan v. Holder*, 982 F. Supp. 2d 69, 80-81 (D.D.C. 2013). More than a temporal connection is required to present a genuine factual issue on pretext in a retaliation case where the employee was accused of misconduct before she engaged in the protected activity. *Hervey v. Cty of Koochiching*, 527 F.3d 711, 723 (8th Cir. 2008).

As evidence of pretext, Plaintiff points to her comparator evidence, the fact that the April 1, 2011 letter was "received with visible and audible laughter," and that there is at least an issue of fact as to whether an investigation was conducted about the concerns raised in Plaintiff's letter.[16] (Dkt. No. 94 at 27-29). In particular, Ani was never asked about the racially offensive comments that she allegedly made.[17] (Dkt. No. 83-4 at 12, 24). This evidence combined with the fact that Defendant finalized its decision to terminate Plaintiff five days after the April 1, 2011 letter (*see* Dkt. No. 77-1 at 6) is enough for a reasonable jury to conclude that Defendant's

---

[16] Plaintiff also points to the fact that the discipline stated on the draft Employee Conference Records changed from a two-day suspension to termination. However, this change took place before Plaintiff engaged in any protected activity. (*See* Dkt. No. 77-3 at ¶ 14, Dkt. No. 77-3 at 36-41).

[17] This fact is disputed. Defendant claims that Inabinet interviewed Ani among others in April of 2011 when investigating Plaintiff's accusations. (Dkt. No. 77-5 at 2). However, Ani's testimony creates an issue of fact on this issue, and viewed in the light most favorable to Plaintiff, a jury could find Defendant did not conduct an adequate investigation.

allegedly retaliatory conduct would not have occurred but for Plaintiff's protected activity.

Therefore, the Court denies summary judgment.

### E. South Carolina Payment of Wages Act Claim[18]

#### 1. Facts

As of July 5, 2010, Plaintiff started on the WOW shift; however, because no Personnel

Action form was filed at the time, Plaintiff did not receive the pay increase associated with the

WOW shift. (Dkt. No. 77-6 at 1-2, 6-7). Human Resources discovered the mistake on March

28, 2011, as part of a routine audit. (*Id.* at ¶ 3). Human Resources proceeded to calculate the

amount owed to Plaintiff and, on April 12, 2011, notified Plaintiff that she could expect the

amount to be deposited into her account on April 29, 2011. (*Id.* at ¶¶ 5-6). It is undisputed that

Plaintiff never notified Defendant that there was any error in her paycheck. (*Id.* at 12).

#### 2. Discussion

The South Carolina Payment of Wages Act ("the Wage Act") requires employers to "pay

all wages due at the time and place designated" by the employer at the time of hiring. S.C. Code

Ann. § 41-10-40(D). If an employer fails to pay wages due under the Act, the employee "may

recover . . . three times the full amount of the unpaid wages, plus costs and reasonable attorney's

fees as the court may allow." S.C. Code Ann. § 41-10-80(C). This penalty is discretionary with

the judge. *Rice v. Multimedia, Inc.* 456 S.E.2d 381, 383 (S.C. 1995).

---

[18] Because he recommended granting summary judgment on all of Plaintiff's federal
claims, the Magistrate Judge recommended declining to exercise jurisdiction over Plaintiff's state
law claims. (Dkt. No. 91 at 24). Because the Court denies summary judgment as to three of
Plaintiff's federal claims, it addresses the state claims as well.

The purpose of the Wage Act is "to protect employees from the unjustified and wilful retention of wages by the employer." *Id.* Thus, an employer "is protected from penalties if there is a good faith dispute over wages allegedly due." *Id.* "[T]he relevant date for determining whether the employer reasonably withheld wages is the time at which the wages were withheld, i.e., when the employer allegedly violated the Act." *Mathis v. Brown & Brown of S.C., Inc.*, 698 S.E.2d 773, 782 (2010). Thus, the court looks to whether, at the time the employer withheld the wages, "it had a good faith reason for doing so." *Id.*

Plaintiff has put forward no evidence of bad faith on the part of Defendant. Plaintiff attempts to create an inference of bad faith from the fact that she was notified of the error after she retained counsel and submitted her April 1, 2011 letter. (Dkt. No. 83 at 26). However, the appropriate time frame for evaluating bad faith is when the wages were actually withheld. Here, a portion of Plaintiff's wages were not timely paid from July of 2010 through March 18, 2011.[19] This time period was prior to her notifying Defendant that she obtained an attorney and prior to her April 1, 2011 letter. The withholding of the WOW differential occurred for a full six months prior to any of the events that led to this law suit, and Plaintiff has put forward no evidence of bad faith on the part of Defendant during that period of time.

Without any such evidence, there is no material question of fact. The question for this Court whether, under the circumstances here, the penalty is warranted. The Court finds that it is not. Here, the employer negligently failed to timely pay full wages when they were due, had an audit procedure in place to catch such errors, did in fact discover the error from those audit procedures, and immediately paid the wages due upon discovering the error. There is no evidence

---

[19] Plaintiff was placed on unpaid leave on March 18, 2011.

of bad faith or that the employer intentionally or wilfully withheld wages. Under these particular circumstances, the Court finds that "[t]he imposition of treble damages . . . would be unjust and harsh." *See Rice*, 456 S.E.2d at 383; *see also id.* at 384 ("Here, Trial Court, finding no evidence that [the employer] acted intentionally or in bad faith, refused to award treble damages. We find no abuse of discretion in this ruling."); *Mathis*, 698 S.E.2d at 782 ("The question before this Court, therefore, is whether, at the time that Appellant reduced Mathis's compensation, it had a reasonable good faith reason for doing so."). Therefore, the Court grants summary judgment on this claim.

**F. Defamation**

A plaintiff must prove four elements to recover on a claim for defamation: "(1) a false and defamatory statement was made; (2) the unprivileged publication was made to a third party; (3) the publisher was at fault; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Fountain v. First Reliance Bank*, 730 S.E.2d 305, 309 (S.C. 2012).

1. "Diverting Drugs" comment

While Plaintiff was charting outside of a patient room, Ms. Brannigan approached her and said "we have a reason to believe that you are diverting drugs." (Dkt. No. 77-7 at 42, 49, 74). Defendant argues that this statement cannot be the basis of a defamation claim because it was true. In her deposition, Plaintiff admitted that the information in Paragraph 1 of the Employee Conference Record, including the incidents of missing medication, was accurate. (Dkt. No. 77-7 at 56, 64). Thus, Defendant did have a reason to believe that Plaintiff was diverting drugs. Plaintiff does not argue that this statement is false, but attempts to combine it with a later

statement that Brannigan had "plenty of proof," which Plaintiff claims was false. These two statements did not occur in the same location, in the same conversation, or in front of the same people. Therefore, the Court considers them separately. As there is no dispute that the statement that Defendant had reason to believe that Plaintiff was diverting drugs was true, it cannot serve as the basis for a defamation claim. *See Fountain*, 730 S.E.2d at 310 (holding that a statement "could not be deemed defamatory because it was unquestionably true").

### 2. "Plenty of proof" comment

After Brannigan approached Plaintiff and stated that they had reason to believe she was diverting drugs, Brannigan escorted Plaintiff downstairs, and Plaintiff provided a urine sample. (Dkt. No. 77-7 at 42-43). After Plaintiff gave the urine sample, Plaintiff said, "this is wrong. This is wrong," and Brannigan replied, "I have plenty of proof." (*Id.* at 43). Defendant argues that there is no evidence that this comment was published to a third party. (Dkt. No. 86 at 14). The Court agrees. It is undisputed that Plaintiff and Brannigan had gone downstairs at this point and were no longer in the location where the "diverting drugs" comment was made. Plaintiff also testifies that Ms. Dingler and the private security officer come back *after* the comment was made. (Dkt. No. 77-7 at 43). A technician administered the drug test, but there is no evidence that he or she was still present for the discussion at issue. (*See* Dkt. No. 77-7 at 46). As Plaintiff has failed to put forward any evidence of publication to a third party, her claim must fail on summary judgment.

### 3. Non-verbal statements

Finally, Plaintiff claims that Defendant's actions "in causing [Plaintiff] to be physically escorted throughout the hospital and into a cab by a fully uniformed security officer and to other

coworkers as if she were a criminal . . . constitute non-verbal false statements that patients, visitors, and coworkers all witnessed." (Dkt. No. 83 at 31-32). However, Plaintiff has cited no authority for the proposition that non-verbal actions can constitute defamation. Such non-verbal actions may be relevant to whether a verbal statement was defamatory by innuendo. *See Fountain*, 730 S.E.2d at 310. However, Plaintiff has cited no authority the proposition the acts themselves are actionable. *See Hoon v. Pate Constr. Co., Inc.*, 607 So.2d 423, 429 (Fl. Ct. App. 1992) ("[W]e have been cited no authority for the proposition that . . . any similar 'non-verbal' act, constitutes legally actionable defamation."). Therefore, the Court grants summary judgment on Plaintiff's defamation claim.

## G. False Imprisonment

### 1. Facts

After Brannigan informed Plaintiff that they had reason to believe she was diverting drugs, Brannigan told her that "[y]ou have to come with me" and escorted her downstairs for a drug test. (Dkt. No. 77-7 at 42). Plaintiff asked whether she had to "be here when they are searching my locker." (*Id.*). Brannigan replied "[n]o, you have to come here, right now, with me," and Plaintiff "knew I didn't do anything wrong. So I just said, Okay, let's go." (*Id.*).

After submitting a urine sample, Ms. Dingler and/or a security officer told Plaintiff that she could not drive her car home and asked if she could call her husband. (*Id.* at 43). Plaintiff replied that he was working, and Dingler and/or the security officer told her that they would call a cab for her. (*Id.*). Then the security officer, Ms. Dingler and another nurse escorted Plaintiff out of the building to wait for the cab. (*Id.*). Plaintiff was not allowed to go back inside the hospital. (*Id.* at 47, 50). Plaintiff wanted to get her wallet out of her car, and the security officer

-31-

escorted her to and from her car. (*Id.* at 43). Those who escorted Plaintiff told the cab driver to take her home, and either they or Plaintiff provided the cab driver with her address. (*Id.* at 50-51). The cab took Plaintiff home. (*Id.* at 43). It is undisputed the no one touched Plaintiff during these events. (Dkt. No. 77-7 at 46, 47).

## 2. Discussion

"In order to recover under a theory of false imprisonment, the complainant must establish (1) the defendant restrained him; (2) the restraint was intentional; and (3) the restraint was unlawful." *Jones by Robinson v. Winn-Dixie Greenville, Inc.*, 456 S.E.2d 429, 432 (S.C. Ct. App. 1995). The tort "does not require an actual injurious touching. False imprisonment may be committed by words alone, or by acts alone or by both, and by merely operating on the will of the individual, or by personal violence, or by both." *Id.* "It is not necessary that the individual be confined within a certain area, or that he be assaulted, or even touched." *Gathers v. Harris Teeter Supermarket, Inc.*, 317 S.E.2d 748, 231 (S.C. Ct. App. 1984).

However, a false imprisonment claim does not lie where the plaintiff has consented to restraint. *Id.* at 754-755. "Where the evidence as to whether consent was given is conflicting, ambiguous, or inconsistent, it becomes a question of fact for the jury." *Id.* at 754.

Defendant argues that to constitute false imprisonment, the restraint must be against Plaintiff's will and voluntarily accompanying another to clear oneself of suspicion or accommodate the desires of others is not imprisonment. (Dkt. No. 77-1 at 29). Multiple jurisdictions have held that it is not enough for plaintiff to feel "mentally restrained" by the actions of the defendant. *Hart v. Seven Resorts Inc.*, 947 P.2d 846, 856 (Ariz. Ct. App. 1997); *Newsom v. Thalhimer Bros., Inc.*, 901 S.W.2d 365, 368 (Tenn. Ct. App. 1994); *Faniel v.*

-32-

*Chesapeake and Potomac Tel. Co. of Md.*, 404 A.2d 147, 151 (D.C. 1979). Rather, "it is essential that the restraint be against the plaintiff's will." *Miller v. Kroger Co.*, 105 S.W.3d 789, 794 (Ark. Ct. App. 2003); *accord Kulich-Grier v. OhioHealth Corp.*, 2014 WL 4460278 at *5 (Ohio Ct. App. Sept. 11, 2014); *see also Gathers*, 317 S.E.2d at 231 (no false imprisonment where plaintiff has consented). Thus, "[s]ubmission to the mere verbal direction of another, unaccompanied by force or threats of any character, does not constitute false imprisonment." *G'Sell v. Carven*, 724 F. Supp. 2d 101, 110 (D.D.C. 2010); *McDonald's Corp. v. Ogborn*, 309 S.W.3d 274, 288 (Ky. Ct. App. 2009); *Miller*, 105 S.W.3d at 794; *Newsome*, 901 S.W.2d at 368; *Faniel*, 404 A.2d at 152; *Mullins v. Rinks, Inc.*, 272 N.E.2d 152, 152 (Ohio Ct. App. 1971).

As the South Carolina Supreme Court has explained,

> The essential thing is the restraint of the person. This may be caused by threats, as well as by actual force; and the threats may be by conduct or by words. If the words or conduct are such as to induce a reasonable apprehension of force and the means of coercion are at hand, a person may be as effectually restrained and deprived of liberty, as by prison bars.

*Westbrook v. Hutchison*, 10 S.E.2d 145, 148 (S.C. 1940); *see also Miraliakbari v. Pennicooke*, 561 S.E.2d 483, 488 (Ga. Ct. App. 2002) ("The restraint constituting a false imprisonment may arise out of words, acts, gestures or the like, which induce a reasonable apprehension that force will be used if plaintiff does not submit; and it is sufficient if they operate upon the will of the person threatened.").[20]

---

[20] However, the fear or threat of losing one's job is not a basis for claim of false imprisonment; such fear is not sufficient to invalidate consent or render an employee's decision not to leave involuntary. *E.g., Miraliakbari*, 561 S.E.2d at 489; *Hart*, 947 P.2d at 856 n.21; *Reavis v. Slominski*, 551 N.W.2d 528, 551-52 (Neb. 1996); *Foley v. Polaroid Corp.*, 508 N.E.2d 72, 77-78 (Mass. 1987).

-33-

The Court finds that whether Plaintiff was "restrained" under this definition is a question for the jury. The presence of a security guard with "means of coercion at hand" could induce "a reasonable apprehension of force." Whether Plaintiff had a "reasonable apprehension of force" with the "means readily at hand," causing her to be restrained or simply submitted to the verbal directions of others is a question for the jury.

Defendant next argues that "[t]o be actionable, the restraint must be complete, rather than the mere obstruction of the right to go where the plaintiff pleases, or the placing [of] plaintiff in a room with a reasonable means of escaping or exiting." (Dkt. No. 77-1 at 29 (citing Restatement (Second) of Torts, § 36; Prosser and Keeton on Rots, 5th ed. § 11)). Merely "preventing another from going in a particular direction" is not false imprisonment. *Watchtower Bible and Tract Society of New York, Inc. v. Sagardia de Jesus*, 634 F.3d 3, 16 (1st Cir. 2011). "Whether the area from which the actor prevents the other from going is so large that it ceases to be a confinement within the area and becomes an exclusion from some other area may depend upon the circumstances of the particular case and be a matter for the judgment of the court or jury." Restatement (Second) of Torts § 36.

Here, simply excluding Plaintiff from entering the hospital would not constitute false imprisonment, as she would be free to walk or drive away. *See Watchtower Bible*, 634 F.3d at 16. However, if Plaintiff was compelled, by the apprehension of force, to accompany Defendant personnel to the lab for a drug test and to stay at the ER exit and not leave once they exited the building, these acts could constitute false imprisonment. *See* Restatement (Second) of Torts § 36 ("If the actor by force or threats of force, or by exerting legal authority, compels another to accompany him from place to place, he has as effectively confined the other as though he had

-34-

locked him in a room."); *Gathers*, 317 S.E.2d at 231 ("It is not necessary that the individual be confined within a certain area."). As explained above, whether Plaintiff had "reasonable apprehension of force" if she attempted to leave the building earlier or walk away from the ER exit, or whether she simply complied with the directives of others is a question for the jury.

Finally, Defendant contends that the alleged restraint was not unlawful because the Defendant "enjoys the right of any property owner and employer to control its premises." (Dkt. No. 77-1 at 29). Defendant cites to *Wright v. United Parcel Service, Inc.*, 445 S.E.2d 657, 659 (S.C. Ct. App. 1994). *Wright* held that if an employee is asked to leave and remains on the property, she becomes a trespasser, and having the employee arrested is not false imprisonment. *Id.* at 523. Here, however, Plaintiff was never asked to leave. Indeed, her claim is based on the premise that she was not allowed to leave but compelled to stay with a security officer until placed in cab. Furthermore, Defendant did not simply expel her from the premises but, viewed in the light most favorable to Plaintiff, forced her to accompany personnel to particular places and did not allow her to leave the hospital except by cab which would take her directly to her home.

Therefore, the Court finds that there are material questions of fact as to Plaintiff's false imprisonment claim and denies summary judgment.

## H. Abuse of Process

"The tort of abuse of process is intended to compensate a party for harm resulting from another party's misuse of the legal system." *Pallares v. Seinar*, 756 S.E.2d 128, 133 (S.C. 2014). The elements of the tort are "(1) an ulterior purpose, and (2) a wilful act in the use of the process that is not proper in the regular conduct of the proceeding." *Id.*

Plaintiff claims that Defendant's report to the South Carolina Board of Nursing (hereinafter "LLR complaint")[21] was an abuse of process. (Dkt. No. 83 at 28). Defendant claims that it is entitled to qualified immunity under S.C. Code Ann. § 40-1-90, that filing of the LLR complaint is not "process," and that Plaintiff has no evidence to establish either prong of the tort. (Dkt. No. 77-1 at 31-32).

### 1. Definition of Process

As Defendant notes, the Court ruled on this issue when considering Defendant's Motion to Dismiss. (*See* Dkt. No. 29). However, the Court addresses it briefly here with additional authority since the Court's 2012 decision. In *Pallares v. Seinar*, the South Carolina Supreme Court explained that, "'[p]rocess,' as used in this context, has been interpreted broadly to include the entire range of procedures incident to the litigation process." 756 S.E.2d 128 at 133; *see also Food Lion, Inc. v. United Food & Commercial Workers Int's Union*, 567 S.E.2d 251, 253 (S.C. Ct. App. 2002) ("In our view, 'process,' as it pertains to the abuse of process tort, embraces the full range of activities and procedures attendant to litigation.").

As the Court explained in its prior Order, "while the initial complaint to the Board may seem preliminary, it is no less a part of a 'process' than a store 'manager's directive to call the police, which resulted in the employment of the criminal process' on an accused shoplifter." (Dkt. No. 29 at 7 n.4 (quoting *Food Lion*, 567 S.E.2d at 254 n.3)). As Defendant notes, a complaint to the Board of Nursing can lead to a formal charge by the Board. (Dkt. No. 5-2 at 24). Such a charge is resolved before an administrative tribunal, whose decision is appealable to

---

[21] The parties refer to this complaint as the LLR complaint. The South Carolina Board of Nursing is a part of the South Carolina Department of Labor, Licensing and Regulation (LLR). For ease of reference, the Court will also refer to this complaint as the LLR complaint.

the Administrative Law Court. *See* S.C. Code Ann. § 410-1-160. Preclusive doctrines like collateral estoppel apply to findings made in such proceedings. *Hainer v. Am. Med. Int'l., Inc.*, 465 S.E.2d 112, 144 (S.C. Ct. App. 1995), *aff'd as modified by* 492 S.E.2d 103 (S.C. 1997).

Given the South Carolina Supreme Court's directive that "process" be "interpreted broadly to include the entire range of procedures incident to the litigation process," the Court finds that making a charge to the Board of Nursing is "incident to the litigation process" and can be the basis of an abuse of process claim. *See Pallares*, 756 S.E.2d at 133.

### 2. Qualified Immunity

A complaint to the LLR "is privileged and no action or proceeding, civil or criminal, may be brought against the person, by or on whose behalf the communication is made, except upon proof that the communication was made with malice." S.C. Code Ann. § 40-1-190. That a report is true and statutorily required is not dispositive of whether it was filed with malice. *Hainer v. Am. Med. Int'l., Inc.*, 492 S.E.2d 103, 106 (S.C. 1997). In order to defeat this statutory immunity, "a plaintiff must demonstrate the defendant made the communication with common law actual malice." *Id.* "Actual malice can mean the defendant acted recklessly or wantonly, or with conscious disregard of the plaintiff's rights" or that "the defendant was actuated by ill will in what he did, with the design to causelessly and wantonly injure the plaintiff; or . . . such recklessness as to show a conscious indifference towards plaintiff's rights." *Id.* at 107; *see also Erickson v. Jones Street Publishers, L.L.C.*, 629 S.E.2d 653, 666 (S.C. 2006) (defining common law malice as "an evil intent or a motive arising from spite or ill will").

Here, Plaintiff has put forward no evidence of malice. She did not address Defendant's argument regarding qualified immunity in briefing or point to any evidence of malice. (Dkt. No.

83 at 27-31). Plaintiff has put forward evidence that Defendant threatened to report her to the nursing board if she did not voluntarily resign.[22] (Dkt. No. 84-10 at 4). While such evidence may indicate an ulterior motive (i.e., Defendant improperly used this threat in negotiations in an attempt to coerce Plaintiff to resign), it does not indicate that the LLR complaint was ultimately filed with "an evil intent," "spite" or "ill-will." Therefore, the Court finds that Defendant is entitled to qualified immunity and grants summary judgment on this claim.

**I. Malicious Prosecution**

In an action for malicious prosecution, the plaintiff must establish: "(1) the institution or continuation of original judicial proceedings; (2) by or at the instance of the defendant; (3) termination of such proceedings in [the] plaintiff's favor; (4) malice in instituting such proceedings; (5) lack of probable cause; and (6) resulting injury or damage." *Pallares v. Seinar*, 756 S.E.2d 128, 131 (S.C. 2014). Plaintiff cannot show that the LLR proceedings terminated in her favor. It is undisputed that these proceedings are still pending. (Dkt. No. 77-7 at 59; Dkt. No. 82 at 27). Therefore, the Court grants summary judgment on this claim.

## IV. CONCLUSION

The Court adopts pages 1-6 of the R & R, the Section "Legitimate, Non-Discriminatory Reason" on page 17, the Section "Hostile Work Environment" on pages 18-21,[23] and the section "ADA Discrimination Claim" on pages 22-23 of the R & R. The Court declines to adopt the

---

[22] This fact is hotly contested, but the Court must view the evidence in the light most favorable to Plaintiff for the purposes of this motion.

[23] While the Court adopts this section of the R & R, it does not adopt the recommendation to grant summary judgment on Plaintiff's Hostile Work Environment claim because of additional arguments raised by Plaintiff in her objections to the R & R.

remaining portions of the R & R. The Court **GRANTS IN PART AND DENIES IN PART**
Defendant's Motion for Summary Judgment (Dkt. No. 77).

The Court grants summary judgment as to Plaintiff's Second Cause of Action (ADA
Claim), Fifth Cause of Action (Wages Act Claim), Sixth Cause of Action (Defamation), Eighth
Cause of Action (Abuse of Process), and Ninth Cause of Action (Malicious Prosecution).[24] The
Court denies summary judgment as to Plaintiff's First Cause of Action (Race/National Origin
Discrimination - Wrongful Termination and Hostile Work Environment Claims), Third Cause of
Action (Retaliation), and Seventh Cause of Action (False Imprisonment).

**IT IS SO ORDERED**.

Richard Mark Gergel
United States District Judge

September 2?, 2014
Charleston, South Carolina

---

[24] The Court previously dismissed Plaintiff's Fourth Cause of Action (Breach of
Contract) and Tenth Cause of Action (Intentional Infliction of Emotional Distress). (Dkt. No.
29)

-39-